**SHELL OIL COMPANY, Appellant,**

v.

**Daniel R. SONGER, Appellee.**

**No. 01–85–00594–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

March 20, 1986.

Rehearing Denied May 20, 1986.

James L. Michalak, Shell Oil Co., Houston, for appellant.

Warren Burnett, Galveston, for appellee.

Before EVANS, C.J., and JACK SMITH and COLEMAN (Retired), JJ.

## OPINION

COLEMAN, Justice (Retired)

This is an appeal from a judgment based on a jury verdict awarding Daniel R. Songer damages in the sum of $760,244.58 to compensate him for injuries sustained by him while he was in the act of repairing an electrical installation belonging to Shell Oil Company. The principal issue is whether Shell owed a duty to Songer to de-activate the lines bringing high voltage electrical current to the accident site. We find that the evidence does not raise such a duty on the part of Shell. Accordingly, the judgment is reversed, and judgment is rendered that Daniel R. Songer take nothing.

Shell and certain other oil companies were engaged in a joint water flood project in West Texas in and around Denver City. As operator of this water flood project, Shell had the responsibility for supplying electrical energy to a number of pumping stations. Shell employed no electricians, but relied on independent contractors to construct and maintain the lines and electrical installations required by the program.

As a result of an electrical storm, the electrical system was damaged. M.D. Arther, president of Arther Electric, Inc., was employed to repair the system. On August 28, 1978, Arther discovered a blown-out lightning arrestor at the installation in question and was able to put the system back in operation by temporary repairs.

The next day Arther, accompanied by Songer and Gary May, both apprentice electricians, went to the installation for the purpose of making permanent repairs. Arther proceeded to de-energize the installation by pulling the transformer fuses and removing the jumpers energizing the transformer bank from the top power lines. At this point, Songer volunteered to change out the lightning arrestors so that Arther could attend to repairs at another location.

Songer told Arther that he was able to finish the repairs and had done a similar job before. Arther then went over the details of these repairs with Songer and specifically warned him to move the aluminum ladder away from the transformer bank after he replaced the lightning arrestor and before he re-energized the transformer bank.

After Arther left, Songer climbed an aluminum ladder and safely replaced the lightning arrestor. He then climbed down off the ladder and attempted to attach the three hot line clamps to the primary voltage overhead lines from the ground by using a "hot-stick." The clamps are designed so that they may be attached to the high voltage lines by use of this instrument, which is made of fiberglass and does not conduct electricity. This procedure is safe if done properly.

After Songer placed the clamps on the hotline, he was able to tighten two of them from the ground by use of the "hot-stick," but could not tighten the third. He climbed back up the aluminum ladder for a distance of about 30 feet where he received an electrical shock and fell to the ground. An expert testified that he probably did not contact the three high voltage lines, but rather a lower line. Songer sustained numerous burns and other injuries, which required the amputation of his right leg.

After the first trial resulted in a hung jury, a second trial was held in March 1985. The jury found that the failure of Shell to de-activate the high voltage lines leading into the accident site was negligence and a proximate cause of the accident in question. The jury also found that on the occasion in question, Songer failed to exercise ordinary care for his own safety, which was a proximate cause of the occurrence in question, and that 50% of the negligence causing the occurrence was attributable to Songer. Shell contends that, as a matter of law, it owed no duty to Songer, and that in any event, there is no evidence that Shell was negligent.

The burden is on a plaintiff to produce facts sufficient to support the legal conclusion that the defendant owed a legal duty to the plaintiff, which it violated. *Abalos v. Oil Development Co.,* 544

S.W.2d 627, 631 (Tex.1976). An owner or occupier of land has a duty to use reasonable care to keep the premises under his control in a safe condition. *Smith v. Henger*, 148 Tex. 456, 226 S.W.2d 425 (1950). This duty to keep the premises safe may subject the owner or occupier to direct liability for negligence in situations arising from a premises defect and in situations arising from an activity or instrumentality over which the owner exercises control. *Redinger v. Living, Inc.*, 689 S.W.2d 415 (Tex.1985).

However, an owner or occupier who engages an independent contractor is not obligated to protect the contractor's employees from hazards that are incidental to, or part of, the work the independent contractor is hired to perform. *Gutierrez v. Exxon Corp.*, 764 F.2d 399, 401 (5th Cir.1985); *Shell Chemical Co. v. Lamb*, 493 S.W.2d 742 (Tex.1973). Also, where the activity is conducted by and is under the control of the independent contractor and the dangerous activity arises out of the activity of its staff, the duty to protect from hazards is that of the independent contractor and not of the owner of the premises. *Abalos*, 544 S.W.2d 627.

Songer contends that this case is not governed by these general rules, because he has produced evidence from which the legal conclusion can be drawn that Shell had the duty to de-energize the lines supplying energy to the area where Songer was attempting the repairs. The evidence relied on was primarily that of Dr. Arther Allan Few, Jr., a professor at Rice University with a joint appointment in the Space Physics and Astronomy Department and the Environmental Science and Engineering Department. He testified that he had done consulting work in the past for various parties, including plaintiffs in lawsuits and utility companies. He testified that he had come through the years to be considered an expert in the field of safety in connection with high voltage electricity and its control.

Dr. Few testified that Shell occupied the position of a "utility" by constructing, operating, and maintaining this high voltage electrical distribution system.

Mr. Melville Zemek, an electrical engineer, was called as an expert witness by Shell. He was employed by the A.I.D. Consulting Engineers, a company that was in the business of doing accident analysis, and had been associated with that company for three years. Previously he had been employed by an insurance company investigating electrical safety for approximately 20 years. He testified that during his work years he frequently used the National Electrical Safety Code. The Code consisted of standards for safety in certain parts of the electrical industry formulated by the International Electric and Electronic Engineers to protect the safety of the public and the employees and property of those responsible for the installation, operation, or maintenance of electrical supply systems. He agreed that under the provisions of the National Electrical Safety Code, the electrical system operated by Shell was an electrical supply system subject to certain safety rules. While he did not consider the installation to be a utility, he agreed that it was a utility as defined in the Code. He further agreed that a utility under the Code had the absolute responsibility to have a designated person in charge of the maintenance and operation of the electrical supply system.

Dr. Few testified that in connection with his work as a consultant, it had been necessary for him to become acquainted with the rules, regulations, and safety codes that applied to a transmission system such as the one operated by Shell. According to Dr. Few, safety codes, rules, and regulations appear in several places, but the National Electrical Safety Code was the one that was particularly applicable to the electrical installation involved in this lawsuit. One of its provisions requires that it be made available and be distributed to people who are employed by the transmission systems. Certain provisions of the National Electrical Safety Code were enacted into law by reference in Tex.Rev.Civ.Stat.Ann. art. 1436a (Vernon 1980).

Dr. Few was recalled to the stand by the plaintiff and was permitted, without objection, to read certain provisions of the National Electrical Safety Code, which he said permitted him to reach the conclusion that the Shell electric supply system was a utility. The Code defined "utility" as "an organization responsible for the installation, operation or maintenance of electric supply or communications systems." "Electric supply lines" were defined in the Code as "those conductors used to transmit electrical energy and their necessary supporting or containing structures. Signal lines of more than 400 volts are always supply lines within the meaning of these rules, and those of less than 400 volts may be considered supply lines if solely run and operated throughout."

Dr. Few also read section 410(c)(1) of the Code, as follows: "Responsibilities: A designated person shall be in charge of the operation of the equipment and the lines and shall be responsible for their safe operation." He had previously testified that the designated person had to be an employee of the utility, and could not be an independent contractor. Finally, Dr. Few was allowed to testify, over objection, that under the National Electric Safety Code, considering the kind of work that was being done, it was the duty and obligation of Shell to de-energize the lines leading into the job site.

Joe Kimmel, who was manager of the Wassum Complex, which included the water flooding project, testified that an employee of Shell Oil Company would have had the responsibility of seeing that the water wells were pumping and of notifying Reinhert if they were not pumping. Reinhert was in charge of system repairs, and it was his responsibility to call a contractor to make the repairs. Kimmel also testified that the employee in charge of making the repairs to the system is the one who is responsible for making sure that it is done safely.

Kimmel testified that Shell purchases electricity from a public utility and distributes electricity through high voltage lines to 67 water wells, all of which are operated by Shell. He testified that no other companies were involved in taking power from the system, but that the system was operated for the benefit of Shell and some seven other companies. He testified that in operating the system, Shell would observe common safety practices in the industry, but that the regulations that apply to publicly related utilities, and the guidelines and codes that they are instructed to abide by, do not apply to this privately owned system.

Article 1446c, sec. 3(c) provides that the term "utility," or "public utility" as used in the Public Utility Regulatory Act, includes any person or corporation owning or operating *for compensation* equipment or facilities producing, generating, transmitting, distributing, selling, or furnishing electricity. Tex.Rev.Civ.Stat.Ann. art. 1446c, sec. 3(c) (Vernon 1980).

■ It may be that Shell is compensated in some manner for its assumption of the responsibility of managing the water flood project, or is being paid for the water used in oil wells owned by other corporations that have joined in the project. However, there is no direct testimony that Shell is compensated for such services or for the water supplied, and there is no testimony or evidence that Shell is directly compensated for the electricity transmitted over its lines. Shell is not a "utility" or "public utility" subject to regulations under this Act because it does not own or operate *for compensation* the facilities that it utilizes to transmit electricity to its water wells.

■ The National Electrical Safety Code is not a law or a regulation enacted by a governmental body. The provisions in the Code as to safety are admissible in this case only insofar as they are recognized and followed by the electrical industry as being the standards in the industry for good safety practices. The evidence does not establish that the rules found in the National Electrical Safety Code are generally observed by either public or private utility companies as the standard for judging the safety practices of these utilities.

The testimony of Dr. Few based solely on the Code will not support the imposition of a duty on Shell greater than that of the owner of premises.

The Texas Supreme Court has recognized that the owner of the premises on which wires conducting high voltage electricity are located owes a duty to an employee of a contractor doing work at the invitation of and beneficial to the owner to use ordinary care to have the premises in a reasonably safe condition. *Houston Lighting and Power Co. v. Brooks,* 336 S.W.2d 603 (Tex.1960).

The Texas Supreme Court, in an opinion holding that a plaintiff had the burden to prove that the defendant had a duty that he breached, approved the Restatement (Second) of Torts, sec. 343 (1965). *Adam Dante Corp. v. Sharpe,* 483 S.W.2d 452, 454 (Tex.1972).

This section of the Restatement of Torts provides that a possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and (c) fails to exercise reasonable care to protect them against the danger.

Shell knew that the employees of its contractor would work on or around high power lines. The issue then is whether Shell should have realized that this work involved an unreasonable risk of harm to these employees and should expect that they would not discover or realize the danger, or that they would fail to protect themselves against it.

■ While there is inherent danger in working around live wires, there is no evidence in this case to suggest that the employees of an electrician, employed for the purpose of repairing an electrical installation, would not realize the danger of accidental contact with the charged line or would fail to take reasonable measures to protect themselves. Shell was neither required to anticipate the methods and procedures by which its contractor would perform the work, nor was it required to anticipate that the contractor would not furnish its employees with appropriate safety equipment and suitable warnings against hazards inherent in and arising from the work. It had no duty to supervise and police the contractor to insure that appropriate safety precautions were taken. *Jenkins v. Fritzler Development Corp.,* 580 S.W.2d 63, 65 (Tex.Civ.App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.).

■ The plaintiff failed to produce evidence raising an issue of fact that under all of the circumstances, Shell should have realized that the condition or use of the premises involved an unreasonable risk of harm to the employees of the contractor. There is no evidence sufficient to raise a duty on the part of Shell to de-activate the lines bringing electricity to the installation on which Songer was working. *Abalos,* 544 S.W.2d at 631.

■ Particularly applicable under the facts in this case is the language of the Texas Supreme Court in *Shell Chemical Co. v. Lamb,* 493 S.W.2d at 748, as follows:

> The dangerous condition in the instant case was peculiar to the technical specialty for which Fisk was employed. Fisk had a duty to perform its work safely, and Fisk was in a superior position to prevent the existence of, to inspect for, and to eliminate or warn its employees of this dangerous condition. This circumstance is not one of those in which a general contractor is required to take the extra measures referred to in the *Pence* case. Instead, this is a circumstance in which the general contractor is not required to anticipate the failure of its subcontractor to discharge its duty to its own employees.

While we are not here concerned with the duty to warn of a hidden danger, because the only ground for recovery was the jury's finding that Shell's failure to de-energize the lines was a negligent act, the evidence

shows that Songer's employer, Arther Electric, Inc., was an independent contractor in control of the installation on which the work was being performed. Arther had a duty to perform its work safely and was in a superior position to eliminate the dangerous condition. Arther Electric knew where the work was to be performed on that date and could have requested the de-activation of the lines in that sector of the system. Arther Electric also had the duty to furnish its employees with such equipment as was necessary to perform the work safely. The dangerous condition in this case arose out of the work activity of Songer and his employer, Arther Electric, Inc. Shell, as the owner or occupier of the premises, did not have a duty to see that an independent contractor performed the work in a safe manner. *Redinger v. Living, Inc.*, 689 S.W.2d 415.

The judgment of the trial court is reversed, and judgment is here rendered that the plaintiff Daniel R. Songer take nothing from the defendant, Shell Oil Company.