**Opinion issued October 16, 2014**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-10-01123-CV

———————————

## ONCOR ELECTRIC DELIVERY COMPANY, LLC, Appellant

## V.

## MARCO MURILLO, Appellee

On Appeal from the 165th District Court
Harris County, Texas
Trial Court Case No. 2008-64374

# EN BANC OPINION

This lawsuit arises from an electrical contact workplace accident that occurred on a tract of property in Dallas. After subcontractor work crews demolished and removed existing apartment complexes located on the property, it was slated for redevelopment. Marco Murillo, an AAA Demolition Company

employee, sustained severe injuries when he attempted to disconnect a cable from within an energized electrical transformer. Murillo sued the property's owner, the developer, the project manager, and the area electrical provider, Oncor Electric Delivery Company, L.L.C. At Murillo's request, the trial court submitted a general negligence question to the jury. The jury found liability against Oncor and three others—AAA (Murillo's employer), Basic Industries, Inc. (the project manager) and Hunt Realty Investments, Inc. (the property developer). It apportioned 60% of the responsibility for Murillo's injuries to Oncor.

Oncor appeals the judgment against it, rendered on the jury's verdict. Oncor contends, among other complaints, that the trial court erred in submitting a general negligence charge to the jury with respect to Oncor, an electricity–carrier defendant. Because the trial court erred in rendering judgment against Oncor on a general negligence claim, we reverse.

## Background

Next Block 1—Dallas, LP acquired an eighty–three–acre tract of property, covering several blocks in Dallas County. At the time, the tract housed nine dilapidated apartment complexes, including the Windfall Apartments. Next Block retained HRC–MJR Development, LLC, an affiliate of Hunt Realty Investments, to provide development management services for the property. HRC–MJR assigned its employee, Scott Shipp, to be the manager for the project.

*Oncor's presence on the property*

Oncor (also referred to as TXU Electric Delivery Company in the testimony and trial exhibits) held an electrical utility easement on the property, filed in the real property records of Dallas County in 1971, and initially granted to Dallas Power & Light Company. The easement granted use of the property within its bounds "for the construction, maintenance, and operation of an electrical transmission." Oncor had provided electric service to the apartments via sets of electrical transformers, housed in metal boxes that stood on concrete pads outside each apartment complex. These transformers converted the higher–voltage transmission line electricity to lower–voltage residential line electricity. Underground cables connected the transformers outside each apartment complex to a series of meters, one for each residence.

Two of these concrete transformer pads were located in front of the former Windfall Apartments. The pads, designated as Pads A and B, housed a set of transformers. On each pad, three opaque metal enclosures, or "boxes," stood in a row: the first and third enclosures housed and entirely enclosed a transformer, and the middle enclosure, known as the secondary enclosure, housed and entirely enclosed equipment that routed the lower–voltage electricity from the transformers into an underground line that connected to the individual apartment electric meters.

Each of the three transformer boxes had an exterior door and an interior door, secured with locks. The transformer boxes conspicuously posted safety warnings. On the exterior door of each box, a sign read:

**WARNING**
Energized Electrical Equipment Inside
**KEEP OUT**
MAY SHOCK, BURN, OR CAUSE DEATH
If Unlocked or Open
Immediately Call
Your TXU Office at
[toll free number]

On the interior doors, a sign read:

**DANGER**
**KEEP AWAY**
IMMEDIATELY CALL
DALLAS POWER & LIGHT CO.
[telephone number]
Contact with certain parts
within this box can cause
electric shock and death
**KEEP AWAY**

The signs included typical illustrations used to warn of danger from electrical shock.

*The redevelopment of the property*

The re–development plans contemplated that Oncor would remove its electrical transformers from the site. Oncor handled transformer removals with an onsite crew that de–energized and removed the electrical equipment and metal boxes.

4

In March 2007, Next Block and Oncor entered into a series of service agreements, in which Oncor charged Next Block a "facilities relocation/removal charge" for the "partial removal of dist[ribution] Services to apt. properties." The agreements terminated upon "completion of removal"; they did not specify a time frame. The agreement identified Shipp as the Next Block company customer representative and required that customer notification be sent to him in care of Hunt Realty Corporation.

Shipp was the development project's sole contact point with Oncor.

*Demolition begins*

At the property, the old apartment buildings required asbestos abatement before further demolition could occur; the asbestos abatement workers required electric power for their equipment. Because the dust generated during asbestos abatement is explosive, the power had to be turned off in the building while they worked, so they powered their equipment either from an adjacent building or from a temporary utility pole.

Jason Hagmeier, an Oncor employee, worked with Shipp on transformer removals from the work site. Periodically, Shipp would contact him and tell him an area that was ready for transformer removal. Hagmeier would then check Oncor's records regarding the transformers involved and forward a removal plan to an Oncor work crew.

5

Oncor would schedule the removal when it had an available crew, usually within six to seven weeks of the request and in consideration of the priorities attendant to other jobs, such as those made necessary by weather–related service issues. Oncor work records show that its crews performed electrical relocation and transformer removal work throughout the property from April through July 2007.

*Demolition at the Windfall Apartments*

With respect to the Windfall Apartments, on April 19, Shipp e–mailed Oncor and asked that it close the metered electricity accounts at the Windfall Apartments "due to demolition of these apartments" and "remove all meters and service from the property." The request listed multiple individual apartment units. The next day, Shipp further requested that Oncor supply power to a "temporary pole set" for the Windfall Apartments—necessary to provide electricity for the asbestos abatement workers. On April 24, an Oncor work crew connected two temporary utility poles installed near the Windfall Apartments.

On May 8, one of the Windfall transformers, on Pad A, caught fire due to a blown electric meter. Oncor sent a crew to the scene to de–energize that transformer. The other transformers remained energized.

On June 7, Shipp requested that Oncor "please cancel the Continuing Service Agreements (CSA's) for the following apartments as soon as possible due to their scheduled demolition: Windfall Apartments." Oncor responded on June

11: "Thank you for your fax. Per your request, CSA [for the Windfall Apartments] ha[s] been cancelled for you effective 6/11/07. If you need any of these properties turned off, please provide a list of those addresses or account numbers." Company records dated June 12 indicate that the temporary service meters were disconnected on June 11, but Oncor neither de–energized nor removed any transformer sets at that time.

*Murillo's employment at the job site*

Basic subcontracted with AAA, Murillo's employer, to demolish one part of the overall project—the part associated with the Windfall Apartments. AAA had salvage rights to any materials it found within the scope of the demolition work, which the contract documents defined as including "buildings, pavement, and private utilities." Because the apartments were very old, they contained valuable copper in the plumbing and wiring within them. Shipp told the subcontractors at the worksite that the transformers and electrical facilities located on the property were the property of Oncor Electric, and were to be left alone and always treated as energized. The transformers and Oncor cables were not within the scope of AAA's demolition work. Shipp testified that he specifically had that conversation with Leo Gomez, AAA's owner and Murillo's worksite supervisor.

Despite Shipp's instructions, Leo Gomez instructed his crew to salvage copper from Oncor's electrical cables and transformer boxes as AAA demolished

the apartment buildings. Murillo had noticed Oncor employees present in the area around the apartment complexes, but he acknowledged that the Oncor employees never spoke with the AAA crew. On occasion, according to Murillo, he saw Oncor work crews remove disconnected transformers after a crew had pulled cables from transformer boxes.

*The accident*

On July 24, Leo Gomez ordered Murillo and the AAA crew to disconnect cables from inside the Oncor transformer boxes near the Windfall Apartments. The AAA crew removed the cables at the Pad A transformer connections, without incident. The next morning, on July 25, the AAA crew removed cables attached inside two boxes on Pad B, also without incident. After lunch, the crew returned to remove the cables from the last transformer box on Pad B. No one on the AAA crew checked to ascertain that the boxes were de–energized, or used a voltage tester, or wore rubber gloves when working inside the transformer boxes.

Wearing work gloves, Murillo reached inside the third transformer box on Pad B, holding a wrench. He intended to disconnect a copper cable attached to the transformer. The transformer was energized. Murillo suffered a severe electrical injury.

*Oncor was not at the scene*

On the day of the accident, Murillo testified that he had noticed Oncor trucks in the neighborhood, parked on a side street outside the construction fence about 500 feet away. But it is undisputed that no Oncor employees were present at the work site that day, and had not been for several weeks. Only AAA employees were present.

After the accident, an Oncor representative arrived at the scene. The representative discovered four Oncor company locks cut open, lying on the ground, in front of Pad B where Murillo's injury occurred. Shipp never saw an open or unlocked transformer door during the course of the project. Although Murillo testified that he once had seen a box door ajar on Pad A, no evidence suggests that the transformer doors on Pad B ever stood open or unlocked before the day of the accident.[1] Murillo denied having seen the locks on the ground next to Pad B, and testified that the exterior and interior cabinet doors on Pad B were unlocked and open. Neither Murillo nor Oncor presented evidence as to who cut off the locks that had secured the transformer boxes.

---

[1] Murillo testified that, several weeks before the accident and before demolition had begun at Windfall Apartments, he saw police officers near a stolen vehicle that had been stripped and left beside a transformer box on Pad A. At that time, according to Murillo, he saw that the door on the box was unlocked and a few inches ajar.

9

*Course of proceedings in the trial court*

Murillo sued Oncor, together with his employer, AAA, the developer, and the contractors at the site. Particular to Oncor, Murillo alleged that it negligently failed to de–energize the transformer on Pad B on June 11, when it disconnected the temporary service to the Windfall Apartments—about a month and a half before the accident. Oncor conceded at trial that it had not de–energized the Pad B transformers.

During the charge conference, the defendants, including Oncor, joined in objecting to the submission of the case as a negligent activity case rather than a premises liability case, contending that "the negligence question needs to be predicated on a finding of control." The defendants further objected

> to the failure to submit a question as to the plaintiff's status, whether he is an invitee, a licensee, or a trespasser. . . . [T]o the extent that there's any fact question about that, the jury under the Olivo case, for a premises liability case, the jury has to be . . . asked about the status of the plaintiff, and then also has to be given the elements for a premises liability claim.

In addition, the defendants tendered a question asking the jury to find whether Murillo was an invitee, a licensee, or a trespasser. Murillo responded that the defendants' proposed question was relevant "only when it's alleged and recovery is sought that a negligent activity of an independent contractor . . . or [based on] a premises defect." Murillo stressed that his case fell under neither scenario. The trial court overruled the objections and denied the tendered submission.

10

The jury found that Oncor, Hunt and Basic "exercise[d] or retain[ed] some control over the manner in which Murillo's work in the transformer was performed, other than the right to order the work to start or stop or to inspect progress or receive reports." It further concluded that Murillo was injured "by or as a contemporaneous result of some negligent activity" of Oncor, Hunt, Basic, and AAA, and that these defendants—other than Oncor—had been engaged in a joint enterprise. The jury placed 60% of the responsibility for Murillo's injuries on Oncor, 20% on AAA, 10% on Basic, and 10% on Hunt. It awarded Murillo $3 million in past and future physical pain and mental anguish, $3 million in past and future disfigurement, $1.5 million in physical impairment, $0 for past medical care, $200,000 for future medical care, $70,000 in loss of past earning capacity, and $0 in lost future earning capacity.

*Proceedings on appeal*

Basic and Hunt settled Murillo's claim against them after submission of this appeal to the panel, but before the panel issued its opinion. AAA did not appeal the trial court's judgment. Thus, the only party appealing the judgment is Oncor.

Initially, a majority of a panel of our court affirmed the trial court's judgment, with one justice dissenting. The panel majority concluded that the claim against Oncor could sound in general negligence and was not one for a premises defect; it further held that legally sufficient evidence supported all of the jury's

11

findings against Oncor. Oncor moved for rehearing and reconsideration en banc. The panel majority then granted the motion for rehearing and revised its opinion, mooting the en banc request; its disposition remained the same. Oncor again moved again for en banc reconsideration. A majority of our court, with two justices dissenting, voted to reconsider this case and withdrew the panel's March 18, 2014 opinion and judgment. We issue this opinion and judgment in their stead.

## Discussion

Oncor's position in this case is unlike any of the other defendants found liable by the jury—AAA (Murillo's employer), Basic (the property manager), or even Hunt (the property developer). Oncor did not control Murillo's salvage work, nor was Oncor's negligence, found by the jury, based on Oncor's contemporaneous negligent acts. Rather, the case against Oncor was that it failed to adequately warn about a dangerous condition (energized transformers in an electrical easement) and failed to exercise reasonable care to make its premises safe (by reasonably protecting others from contact with energized transformers in its electrical easement).

At the trial court charge conference, Oncor objected that there was no evidence to support a finding that it controlled Murillo's work. In the trial court, Oncor expressly adopted Basic's request that the trial court instruct the jury on a premises–liability theory of negligence rather than a negligent activity. Because

12

we conclude that Oncor's challenge to the general negligence verdict is dispositive of the appeal, we do not reach Oncor's contention that Murillo was a trespasser in its electrical boxes, warranting an even more limited duty instruction to the jury; we also need not address its remaining appellate challenges. Our resolution of the case turns on Oncor's role at the premises and its corresponding legal duty.

## I.     Defining a premises owner or occupant for claims in negligence

Oncor adduced evidence that the transformers stood on its electrical utility easement, an easement filed in the real property records of Dallas County in 1971 and initially granted to Dallas Power & Light Company. The easement grants Oncor use of the property within its bounds "for the construction, maintenance, and operation of an electrical transmission." Oncor exercised this right in constructing the cement transformer pads and in placing and operating electrical transformers on them.

Murillo responds that Oncor, as an easement holder, did not own the property on which the transformers stood, and thus could not be held liable under a premises–liability theory. *See Marcus Cable Assocs. v. Krohn*, 90 S.W.3d 697, 700 (Tex. 2002) (explaining that easement is "non–possessory interest that authorizes its holder to use the property for only particular purposes") (citing RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 1.2 cmt. d). Thus, Murillo

13

argues, Oncor cannot rely on the more limited scope of duty applicable to a premises owner not actively engaged in any activity.

An easement holder who controls or occupies the easement, however, may be liable in tort as an occupier of the property. The question of legal title for real property purposes does not define whether a possessor of property has a legal duty to answer in tort for premises defects it creates. For tort claims like this one, a "possessor of land" is different than in the property rights context. A "possessor of land" for the purposes of defining a legal duty in tort is:

> (a) a person who is in occupation of the land with intent to control it, or
>
> (b) a person who has been in occupation of land with intent to control it, if no other person has subsequently occupied it with intent to control it, or
>
> (c) a person who is entitled to immediate occupation of the land, if no other person is in possession under Clauses (a) and (b).

RESTATEMENT (SECOND) TORTS § 328E (1965). "The important thing in the law of torts is the possession, and not whether it is or is not rightful as between the possessor and some third person." *Id.* cmt. a.

Accordingly, "[a] premises–liability defendant may be held liable for a dangerous condition on the property if it 'assum[ed] control over and responsibility for the premises,' even if it did not own or physically occupy the property." *Cnty. of Cameron v. Brown*, 80 S.W.3d 549, 556 (Tex. 2002) (concluding that, for

14

purposes of premises–liability claim, county assumed sufficient control over state–owned causeway because it had maintenance contract with state that included responsibilities over causeway's streetlight system) (quoting *City of Denton v. Van Page*, 701 S.W.2d 831, 835 (Tex. 1986)). "The relevant inquiry is whether the defendant assumed sufficient control over the part of the premises that presented the alleged danger so that the defendant had the responsibility to remedy it." *Id.*; *see Entergy Gulf States, Inc. v. Isom*, 143 S.W.3d 486, 489–90 (Tex. App.—Beaumont 2004, pet. denied) (analyzing case in which injury occurred from unmarked guy wire on utility company's right–of–way as premises–liability claim); *Roberts v. Friendswood Dev. Co.*, 886 S.W.2d 363, 367 (Tex. App.—Houston [1st Dist.] 1994, writ denied) (observing that easement holder has duty to use ordinary care regarding use and maintenance of easement); *see also Kibbons v. Union Elec. Co.*, 823 S.W.2d 485, 489 (Mo. 1992) (property owner owed no duty to construction worker who was injured when truck ran into uninsulated 7200–volt power line over property; electricity provider held easement in which it placed utility pole, had exclusive control and thus corresponding duty to inspect and maintain lines); *Reyna v. Ayco Dev. Corp.*, 788 S.W.2d 722, 724 (Tex. App.—Austin 1990, writ denied) (where city, as holder of easement, had exclusive use and control of easement property, apartment complex property owner had no control over and thus no duty to repair open and energized electrical switching

cabinet that caused injury to child tenant).

Oncor adduced evidence that the transformers stood on its electrical utility easement filed in the real property records of Dallas County. The easement granted Oncor the right to construct and operate an electric transmission and distribution system within its bounds. Oncor undisputedly controlled the transformers on the easement as of the date of Murillo's injury, and it introduced evidence that it was the easement holder; it follows that Oncor had some control over the premises on that date. As the easement holder and the party that controlled the transformers, we hold that Oncor qualified as an occupier of the premises for the purposes of creating a duty in tort. We therefore consider whether the record supports the jury's finding that Oncor negligently engaged in an activity that caused Murillo's injuries, or whether its duty to Murillo was limited to that of an occupier of the premises at the time of the incident.

## II. Defining a premises occupant's scope of liability: negligent activity vs. negligently furnishing a dangerous condition

Texas courts have consistently recognized that negligent–activity claims and premises–defect claims are independent theories of recovery, and a finding of one will not suffice to create liability for the other. *See Gen. Elec. Co. v. Moritz*, 257 S.W.3d 211, 214–15 (Tex. 2008) (distinguishing between negligent–activity theory and premises–condition theory); *Clayton W. Williams, Jr., Inc. v. Olivo*, 952

16

S.W.2d 523, 527 (Tex. 1997) (noting "two types of negligence in failing to keep the premises safe: that arising from an activity on the premises, and that arising from a premises defect"); *see also Mayer v. Willowbrook Plaza Ltd. P'ship*, 278 S.W.3d 901, 909 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("Negligent activity and premises defect are independent theories of recovery.").

Although "[t]he lines between negligent activity and premises liability are sometimes unclear," "negligent activity encompasses a malfeasance theory based on affirmative, contemporaneous conduct by the owner that caused the injury, while premises liability encompasses a nonfeasance theory, based on the owner's failure to take measures to make the property safe." *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 776 (Tex. 2010). A finding of liability for a negligent–activity theory "requires that the person have been injured by or as a contemporaneous result of the activity itself rather than by a condition created by the activity." *Keetch v. Kroger Co.*, 845 S.W.2d 262, 264 (Tex. 1992); *see Olivo*, 952 S.W.2d at 527. In contrast, to assess liability in negligence for a premises defect, an injury must occur as a result of a dangerous condition that the defendant knows or should have known to exist yet fails to reasonably warn of the condition or take reasonable measures to remedy it. *Mayer*, 278 S.W.3d at 909.

Both kinds of negligence claims require proof of the existence of a legal duty owed by the defendant to the plaintiff, a breach of that duty, and damages

17

proximately resulting from the breach. *See W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005); *West v. SMG*, 318 S.W.3d 430, 438 (Tex. App.—Houston [1st Dist.] 2010, no pet.). Under a premises–defect theory, however, the scope of the duty is more singularly defined: the plaintiff must establish that (1) the premises owner or operator had actual or constructive knowledge of the complained–of condition; and (2) the complained–of condition posed an unreasonable risk of harm. *Olivo*, 952 S.W.2d at 529 (citing *Corbin v. Safeway Stores, Inc.*, 648 S.W.2d 292, 296 (Tex. 1983)). A claim for an injury that resulted from a premises defect cannot stand without jury findings and proof to support these specific elements. *See id.* To determine whether Murillo's case against Oncor is a negligent–activity case or a premises–defect case, we examine the allegations and proof adduced at trial.

It is undisputed that Oncor's last activity with respect to the transformers was on June 11 or 12. At that time—more than a month before Murillo's injury—Oncor read the nearby temporary meters, removed them, and closed the temporary electrical account. On June 7, Scott Shipp requested that Oncor "please cancel the Continuing Service Agreements (CSA's) for the following apartments as soon as possible due to their scheduled demolition: Windfall Apartments." Oncor responded on June 11: "Thank you for your fax. Per your request, CSA [for the Windfall Apartments] ha[s] been cancelled for you effective 6/11/07. If you need

18

any of these properties turned off, please provide a list of those addresses or account numbers." Work records dated June 12 indicate that this work was done.

Murillo argues that Oncor caused his injuries when it disconnected the temporary service to the Windfall Apartments, and left the corresponding transformer energized when Scott Shipp closed the temporary electricity account. Murillo does not claim that Oncor supervised or controlled Murillo's work at the jobsite—or that Oncor was present at the site on the day of the accident. Rather, Murillo contends that Oncor's negligence was in leaving the transformer energized when Oncor should have turned it off.

But Murillo points to no evidence that Oncor was obligated to de–energize its transformer, that it had been instructed to do so, or that it verified to anyone associated with the project that the Pad B transformer was either energized or de–energized. On the day of the accident, although Murillo had noticed Oncor trucks parked on the street outside the construction fence about 500 feet away, no Oncor employees were present at the work site.

No evidence supports the jury's finding that Oncor exercised or retained any control over Murillo's work; according to Murillo, the Oncor employees never even spoke to anyone on the AAA crew. Absent "a relationship between the parties giving rise to the right of control, one person is under no legal duty to control the conduct of another, even if there exists the practical ability to do so."

19

*Graff v. Beard*, 858 S.W.2d 918, 920 (Tex. 1993). Control over distribution of electrical power is not control over demolition and salvage work.

Shipp told all contractors at the site that Oncor had transformers located on the property and that these transformers "were to be left alone and treated as energized." The transformers were not within the scope of any demolition work. Shipp specifically informed Leo Gomez, AAA's owner and Murillo's worksite supervisor, to consider the transformers to be energized. The signage on the transformer box doors declared "DANGER, KEEP AWAY." It warned that energized electrical equipment was inside and of the dire consequences that contact could cause.

Oncor did not contemporaneously energize the transformer while Murillo worked, or tell anyone at the worksite that it had been switched off when in fact it was not. Without evidence of such acts, Oncor, as an electricity provider, had no general duty to recognize and prevent electrical contact during a construction project. *See Houston Lighting & Power v. Brooks,* 336 S.W.2d 603, 606 (Tex. 1960) (holding that, where electricity supplier had its employees on construction site from time to time in connection with supplying temporary electricity, any knowledge supplier's employees had of building construction was incidental to supplying electricity; thus, construction worker who was injured when he contacted live high–voltage electrical transmission lines "wholly failed to establish

any reason" why electricity supplier should have foreseen injury, and "no duty arises to act to prevent such unanticipated injury").

Because Oncor's failure to turn off an existing energized electrical transformer was not contemporaneous with Murillo's injury, it is insufficient to create liability for general negligence. Without evidence of contemporaneous conduct, Murillo's claim against Oncor is "a nonfeasance theory, based on [Oncor's] failure to take measures to make the property safe," and not an activity "based on affirmative, contemporaneous conduct by [Oncor] that caused the injury." *See Del Lago Partners,* 307 S.W.3d at 776. Texas courts have consistently considered similar circumstances under a premises–liability theory. *See, e.g.*, *Shell Chem. Co. v. Lamb*, 493 S.W.2d 742, 748 (Tex. 1973) (holding that premises owner had no duty to warn electrical subcontractor of potential for electric shock from condition which subcontractor was hired to repair); *Shell Oil Co. v. Songer*, 710 S.W.2d 615, 620–21 (Tex. App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.) (concluding that Shell did not have legal duty to protect electrician–contractor by de–energizing electrical system while under repair); *Corpus v. K–J Oil Co.*, 720 S.W.2d 672, 674 (Tex. App.—Austin 1986, writ ref'd n.r.e.) (concluding that premises occupier was not liable for crewmember's injury when rig boom made contact with overhead electric power line; power line was reasonably apparent condition and did not give rise to duty to warn); *Allen v. Tex.*

*Elec. Serv. Co.*, 350 S.W.2d 866, 868–69 (Tex. Civ. App.—Fort Worth 1961, writ ref'd n.r.e) (affirming take–nothing judgment on grounds that electric service company had no right of control and owed no duty to warn electrical worker hired to repair power lines injured when he came into contact with energized line); *see also Le Vonas v. Acme Paper Bd. Co.*, 40 A.2d 43, 47 (Md. 1944) (holding that company that retained independent contractor to hoist steel beams to roof had no duty to warn contractor's employees who sustained injuries when beam made contact with live wires hanging near cable used to hoist beams), *cited with approval in Allen*, 350 S.W.2d at 869.[2]

Murillo identifies no other negligent act with respect to Oncor. Neither Murillo nor anyone else testified that Oncor authorized Gomez or the AAA demolition crew to enter its transformer boxes. Murillo stated that he saw Oncor trucks parked on Rambler street—the street that the Windfall Apartments faced—

---

[2] We disagree with the dissent's position that *Texas Department of Transportation v. Ramming* supports a general negligence submission in this case. 861 S.W.2d 460 (Tex. App.—Houston [14th Dist.] 1993, writ denied). In *Ramming*, a car accident occurred at an intersection where the Department's signal maintenance technician had turned off a traffic signal during testing and repair "[i]mmediately prior to the accident." *Id.* at 463. Our sister court stressed that "[t]he injuries suffered by [the accident victim] did not arise from the 'absence, condition, or malfunction' of a traffic signal," but rather, the technician's botched attempt to take an amperage reading, which "simultaneously created the accident–causing condition or malfunction." *See id.* at 464–65. The accident in this case did not result from any contemporaneous conduct of Oncor.

22

in the two days before the incident, about 500 feet away, but he never interacted with an Oncor employee. The evidence raises no reasonable inference that Oncor engaged in a contemporaneous negligent activity that caused Murillo's injury. *See Brooks,* 336 S.W.2d at 606 (power company employees in the vicinity of construction project created no duty in general negligence to project's construction workers).

The record lacks evidence that Oncor engaged in any negligent activity contemporaneous with Murillo's injury at the jobsite, or controlled the details of Murillo's work, or had a hand in salvaging cable, or authorized entry into the transformers it operated within its electrical easement, or represented to anyone the status of its transformer as de–energized. Without such evidence, Oncor's duty was, at most, that of an occupier of the premises. As a premises defendant, Oncor was entitled to standard jury instructions that would have defined the scope of Oncor's duty to Murillo in light of the warnings to those who came near its energized transformers and the efforts Oncor made to keep its premises safe. *See Brooks,* 336 S.W.2d at 603 (holding that electrical supplier owed no duty in general negligence to construction worker injured by contact with live high–voltage electrical transmission lines on construction site); *compare Tex. Dep't of Transp. v. Ramming*, 861 S.W.2d 460, 465–66 (Tex. App.—Houston [14th Dist.] 1993, writ denied) (concluding that car accident that occurred at intersection where

employee had turned off traffic signal during ongoing repair resulted from negligent activity) *with Kroger Co. v. Persley*, 261 S.W.3d 316, 320–21 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (pleadings did not present negligent–activity claim where plaintiff slipped on water near freezer display, evidence showed that freezer's stocker had left the area at least fifteen minutes before, and plaintiff admitted she did not see stocker near display when she slipped).

The jury's findings in general negligence, rather than premises liability, will not support a judgment against Oncor. *See Olivo*, 952 S.W.2d at 529–30 (submission under negligent–activity theory did not address essential premises–defect elements about knowledge and risk of harm and thus could not support deemed findings under Tex. R. Civ. P. 279). The trial court therefore erred in entering judgment against Oncor. *See id.*

## III. Disposition

In its prayer for relief, Oncor asks for reversal and either rendition of judgment or remand for a new trial. We consider which disposition is appropriate.

In *Olivo*, the Texas Supreme Court rendered judgment when a broad-form negligence question was submitted that failed to instruct the jury on the premises liability factors. *See id.* Since then, the Court has provided further guidance concerning when remand, rather than rendition, is appropriate by distinguishing between whether the omitted instructions made the question immaterial or merely

defective.  *See Torrington Co. v. Stutzman*, 46 S.W.3d 829, 839 (Tex. 2000).  The

Court explained:

> The cases in which we have concluded that a question was merely
> defective, as opposed to immaterial, the question at issue attempted to
> submit a theory to the jury that did not require the determination of
> predicate facts to establish a legal duty, and thus attempted to submit a
> controlling issue, albeit defectively.  But in *Olivo*, the defendant owed
> no duty toward the plaintiff unless specific factual predicates were
> established.  Without any determination that the specific factual
> predicates were met, the question did not submit a controlling issue.
> In other words, absent any determination that the factual predicates
> giving rise to a legal duty were satisfied, the defendants' failure to use
> reasonable care was of no legal consequence.

*Id.* at 840 (citations and footnote omitted).

The Court observed that, because Torrington owed no legal duty toward the

plaintiffs absent a predicate finding of duty, "Torrington's failure to use ordinary

care is immaterial and rendition would normally be proper."  *Id.*  But it

nevertheless remanded the case in the interest of justice because the Court had not

previously considered how a negligent undertaking claim should be submitted to

the jury, and no prior appellate decision in Texas had directly addressed whether

the factual predicates giving rise to a negligent undertaking claim should be

submitted to a jury or decided by the court as a question of law.  *Id.* (citing TEX. R.

APP. P. 60.3).  In contrast, the Court observed that it did not find a remand in the

interest of justice warranted in *Olivo* "because the distinction between premises

25

liability claims and negligent activity cases, and the requirement that the *Corbin* elements be submitted in premises liability cases, were well established by the time the case was decided." *Id.* at 841.

*Olivo* controls the disposition in this case. Murillo specifically opposed the defendants' proposed questions asking the jury to make the predicate finding—a required element in premises–liability cases—as to whether he was a licensee, an invitee, or a trespasser. The defendants also sought submission of the claim as one for premises liability: framed with respect to the condition of the premises and whether that condition posed an unreasonable risk of harm. Murillo expressly refused to submit the case to the jury under a premises–liability theory, and the distinction between premises–liability claims and negligent–activity cases is well-established. The evidence in this case does not demonstrate the latter: a negligence question, without more, cannot support a judgment against a possessor of land. *See Torrington*, 46 S.W.3d at 838. Because the premises–liability theory required the determination of predicate facts to establish the appropriate legal duty, and the charge did not submit these predicate facts to the jury, we must render judgment. *See id*; *see also Olivo,* 952 S.W.2d at 529–30.

## Conclusion

Because an existing energized transformer within an electrical easement is a condition of the premises, and not a contemporaneous negligent activity, the trial court erred in rendering judgment against an electricity provider based on a general negligence claim.  We reverse the trial court's judgment against Oncor and render judgment that Murillo take nothing on that claim.  The judgment against the other defendants remains undisturbed.


Jane Bland
Justice

Justice Bland, joined by Chief Justice Radack, and by Justices Jennings, Higley, Massengale, and Huddle, for the en banc court.

Justice Keyes, joined by Justice Sharp, dissenting.

Justice Brown, not participating.