**Hilario TORRES, Appellant**

v.

**CHAUNCEY MANSELL & MUELLER SUPPLY COMPANY, INC.,**
**Appellees**

**No. 07–16–00016–CV**

Court of Appeals of Texas,
Amarillo.

March 3, 2017

Rehearing Overruled April 26, 2017

John B. Messer, Sean R. Cox, Jose L. Lopez, for Hilario Torres.

William E. Reid, John M. Frick, for Chauncey Mansell & Mueller Supply Company, Inc.

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

## OPINION

Brian Quinn, Chief Justice

Before us is an appeal and cross-appeal from a final summary judgment. Hilario Torres contends that the trial court erred in granting the motion and denying him recovery against Chauncey Mansell and Mueller Supply Co., Inc. (collectively referred to as Mueller). Mueller argues, via the cross-appeal, that the trial court erred in overruling his motion to modify the judgment to include therein a ruling on its objections to Torres' summary judgment evidence. We affirm.

*Background*

The dispute began when Torres was electrocuted. According to the summary judgment evidence, he worked for a subcontractor (Chino) hired by A & S Construction to lay a cement parking lot surrounding the sales office Mueller was building for itself. Mueller (the property owner) had hired A & S Construction as the general contractor and assigned Mansell (one of its employees) to coordinate and monitor the job.

At the time of the incident in question, Torres was working at night and attempting to smooth or level the surface of some freshly poured concrete. While doing that, the metal handle of the bull float (also called the "mapa," "avion," and "airplane") he utilized to perform his task touched an electrical line. The line was over or adjacent to that portion of the lot being completed. Apparently, the float's handle approximated 16' in length, and it contacted the live wire as Torres pulled the float across the cement's surface towards him. Torres testified, via deposition, that he knew of the line's presence after having seen it days before.

Torres also testified that "people" from Mueller not only were at the scene but also were the ones who told him and his colleagues "what to do there." Who those people were, he could not remember, though. Furthermore, the assumption that they were from Mueller was based on comments from his coworkers. He admitted, though, that he personally did not know who they were. Those coworkers also said that because someone from Mueller allegedly was there, "we should do a good job." According to the same deposition testimony, the unknown Mueller people (along with Brian Alvey of A & S Construction) told Torres and his compatriots "to pour the concrete." None, however, directed him to use the float or mapa. Instead, Torres reiterated, they said "[y]ou're going to pour this cement" and [e]verybody do your particular job."

Touching the live electrical line resulted in Torres suffering extensive injury and the suit underlying this appeal. In his suit, Torres asserted that the presence of the live power lines created an unreasonably dangerous condition. Furthermore, the causes of action alleged against Mueller sounded in premises liability, active negligence, negligence per se, and gross negli-

gence. Mueller joined issue and eventually filed a traditional motion for summary judgment.

In the motion for summary judgment, Mueller invoked Chapter 95 of the Texas Civil Practice and Remedies Code, argued that it controlled the disposition of the entire lawsuit, and contended that the summary judgment evidence negated Torres' ability to satisfy the requirements of that statute as a matter of law. It also argued the summary judgment evidence established that 1) it retained no control over the work performed by Torres or his employer, 2) the overhead lines were known to Torres, and 3) the statute under which Torres sought to impose negligence per se was inapplicable to it. Torres responded to the motion with his own evidence, argument, and a motion for a continuance to conduct additional discovery.

The trial court denied the motion for continuance but granted that seeking a summary judgment. No ground was mentioned as the basis for granting summary judgment, though. And, one motion that went unresolved was that filed by Mueller wherein it objected to aspects of the summary judgment evidence proffered by Torres. This omission was made the subject of a motion to modify the judgment, which motion was not granted.

*Standard of Review*

First, because this appeal was transferred from the Third Court of Appeals, we are bound to apply its precedent and that of the Texas Supreme Court. *See* Tex. R. App. P. 41.3 (stating that "[i]n cases transferred by the Supreme Court from one court of appeals to another, the court of appeals to which the case is transferred must decide the case in accordance with the precedent of the transferor court under principles of stare decisis if the transferee court's decision otherwise would have

been inconsistent with the precedent of the transferor court.")

Second, we need not reiterate the relevant standard of review in an appeal from a summary judgment. It is well settled and described in *Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445 (Tex. 2015), and *Cantu v. Southern Ins. Co.*, No. 03-14-00533-CV, 2015 WL 5096858, 2015 Tex. App. LEXIS 8847 (Tex. App.–Austin Aug. 25, 2015, no pet.) (mem. op.). The parties are referred to those cases for its description.

Third, our Supreme Court, in *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150 (Tex. 2004), described the standard of review utilized when addressing whether a trial court erred in denying a motion for continuance seeking time to conduct discovery. *Id.* at 160–161; *see Melton v. Farrow*, No. 03-13-00542-CV, 2015 WL 681491, 2015 Tex. App. LEXIS 1224 (Tex. App.–Austin Feb. 10, 2015, pet. denied) (mem. op.) (reiterating the standard stated in *Joe v. Two Thirty Nine Joint Venture*). It too will be applied when we address that issue.

***Torres' Appeal***

Torres asserts various grounds allegedly warranting a reversal of the trial court's decision to grant Mueller's motion for summary judgment. We address each in turn.

*Texas Civil Practice and Remedies Code § 95.001 et seq*

The first ground we address involves the application of Chapter 95 of the Texas Civil Practice and Remedies Code. Torres believes the statute to be inapplicable because the improvement being completed did not cause his injury. We disagree.

Chapter 95 controls recovery in a "claim . . . against a property owner, contractor, or subcontractor for personal injury, death, or property damage to an owner, a contractor, or a subcontractor or an employee of a contractor or subcontractor . . .

that arises from the condition or use of an improvement to real property where the contractor or subcontractor constructs, repairs, renovates, or modifies the improvement." Tex. Civ. Prac. & Rem. Code Ann. § 95.002(1) & (2) (West 2011). If the claim falls within the scope of § 95.002(1) and (2) then the property owner "is not liable" for personal injury, death or property damage "arising from the failure to provide a safe workplace unless" two hurdles are cleared. *Id.* § 95.003. The first requires proof that the owner exercised or retained some control over the manner in which the work is performed; however, the control must involve more than the right to order the work to start or stop, to inspect progress, and to receive reports. *Id.* § 95.003(1). Under the second hurdle, it must be shown that the owner had actual knowledge of the danger or condition resulting in the injury, death or damage, and failed to adequately warn of that danger. *Id.* § 95.003(2).

The scope of the statute is quite broad given the definition of the word "claim." It means "a claim for damages caused by negligence," *id.* § 95.001(1), and the Supreme Court has chosen not to interpret that language as distinguishing between negligence claims "based on contemporaneous activity or otherwise" because the legislature made no such distinctions. *Abutahoun v. Dow Chem. Co.*, 463 S.W.3d 42, 48 (Tex. 2015). That is, "Chapter 95's plain language does not require the court to classify certain negligence claims for different treatment." *Id.* at 49 n.7. Rather, it encompasses "all negligence claims that arise from either a premises defect or the negligent activity of a property owner or its employees." *Id.* at 50; *Ineos USA, L.L.C. v. Elmgren*, 505 S.W.3d 555, 562 (Tex. 2016) (reiterating that Chapter 95 applies to all negligence based claims).

The Supreme Court, in *Abutahoun*, took the opportunity to discuss and define other words found in the statute as well. For instance, the word "condition" was construed as meaning "'either an intentional or an inadvertent state of being.'" *Abutahoun*, 463 S.W.3d at 49, quoting *Sparkman v. Maxwell*, 519 S.W.2d 852 (Tex. 1975); accord, *4front Engineered Solutions, Inc. v. Rosales*, 505 S.W.3d 905, 912 (Tex. 2016) (involving Chapter 95 and observing that "[b]y asking about a 'condition of the premises,' this question [in the jury instructions] presented a premises-liability theory that focuses on the 'state of being' of the property itself"). In turn, "use" was interpreted as meaning "'to put or bring into action or service'" or to "'employ for or apply to a given purpose.'" *Abutahoun*, 463 S.W.3d at 49, quoting *Tex. Dept. of Crim. Justice v. Miller*, 51 S.W.3d 583, 588 (Tex. 2001).

One other term undefined in Chapter 95 but discussed by the Court was "improvement." And, the Court opted to "broadly define[ ] [it] to include 'all additions to the freehold except for trade fixtures [that] can be removed without injury to the property.'" *Id.* at 49, quoting *Sonnier v. Chisholm–Ryder Co.*, 909 S.W.2d 475, 479 (Tex. 1995). The broad nature of the definition was reconfirmed by the Supreme Court in *Ineos. Ineos USA, L.L.C. v. Elmgren*, 505 S.W.3d at 568. And, in doing that, the Court in *Ineos* provided additional guidance we find helpful here.

Elmgren had been sent to replace a valve on a furnace header owned by Ineos. *Id.* at 559. While doing that there appeared a gas leak from a pipe valve apparently connected to a different furnace. *Id.* at 559–60. That leak caused Elmgren's eventual injuries, and he sued Ineos for damages. *Id.* at 560. Ineos defended against the claim by contending that Chapter 95 applied. *Id.* at 560. Elmgren read

Chapter 95 as applying only when the injury results from a condition or use of the "same improvement" on which the contractor (or his employee) was working when the injury occurs. Those were not the circumstances in his case, according to Elmgren. His injuries arose from a leaking valve of a furnace other than the one on which he worked. In response, the Supreme Court agreed that "Chapter 95 only applie[d] when the injury results from a condition or use of the same improvement on which the contractor (or its employee) is working when the injury occurs." *Id.* at 567. But, it disagreed with Elmgren's proposition that the Chapter was inapplicable because his injuries arose from something he was not attempting to repair. In explaining why, the court alluded to its broad definition of "improvement" and observed that "[t]he valves and furnaces, though perhaps 'separate' in a most technical sense, were all part of a single processing system *within a single plant on Ineos' property*." *Id.* at 568 (emphasis added). It eschewed the invitation to " 'divide the plant's 'gas process' system of furnaces and headers valve-by-valve or line-by-line into separate, discrete improvements.' " *Id.*, quoting *Elmgren v. Ineos USA, LLC,* 431 S.W.3d 657, 664 (Tex. App.–Houston [14th Dist.] 2014). Instead, it opted to view "the entire system [as] a single 'improvement' under Chapter 95." *Id.*

■ We read *Ineos* as directing us to determine what the "improvement" is by looking at it as a whole, not in potentially divisible parcels. What constitutes the improvement is not limited to the specific mechanism (e.g. gas valve) causing the injury. Rather, the interrelationship of the mechanism with its physical (e.g. within a "single processing system") and geographic (e.g. "within a single plant on Ineos' property") environments are factors that define the improvement's breadth. *See Rawson v. Oxea Corp.,* No. 01-15-01005-CV, 2016 WL 7671375 at *8, 2016 Tex. App. LEXIS 13635 at *22 (Tex. App.–Houston [1st Dist.] Dec. 22, 2016, no pet.) (mem. op.) (holding the improvement to be the electrical substation itself despite Rawson's electrocution being caused by electricity from one transformer in that substation feeding back to an electrical line he touched while repairing the insulators of a different transformer in the same substation). With that said, we turn to the case at bar.

Torres argued that the trial court erred in granting summary judgment because the summary judgment evidence failed to prove, as a matter of law, that 1) Chapter 95 applied and 2) if it did, Mueller exercised insufficient control over the project or lacked actual knowledge of the dangerous condition. We disagree.

As for the matter of Chapter 95's application, it is clear that Mueller was constructing an edifice from which to operate its business and part of that edifice consisted of a cement parking lot. Equally undisputed is that Torres' employer was hired to help complete or install the parking lot and Torres was injured when the tool used to perform that task touched an electrical line. Furthermore, the electrical line hung over or near to that part of the lot he was surfacing with the float. In attempting to explain why Chapter 95 had no application under these circumstances, Torres said that he

was a cement finisher on a project pouring cement for a parking lot. The injury did not arise from any condition or use of the cement or parking lot. Rather, the injury arose from an overhead high voltage power line with which one of [his] tools came into contact. The tool was not being used for work on the power line. Thus under the plain statutory language,

Chapter 95 does not apply to the circumstances in this case.

To support his argument, he also cited the opinion in *Hernandez v. Brinker Int'l., Inc.*, 285 S.W.3d 152 (Tex. App.–Houston [14th Dist.] 2009, no pet.) (plurality opinion). There, Hernandez was assigned the task of repairing an air conditioner located atop a restaurant. While walking on a part of the roof of the building near the air conditioner, the roof collapsed, and he fell through. Hernandez argued that Chapter 95 did not apply because he was hired to work on the air conditioner, not the roof, and his injuries were caused by the roof collapsing, not the air conditioner. The reviewing court agreed. *Id.* at 161–62 (holding that "Hernandez's claim arises from the condition of the roof, but Hernandez did not repair or modify the roof. Hernandez repaired the air-conditioning system. Thus, under the plain language of section 95.002(2), Chapter 95 does not apply to Hernandez's claims.").

Though a plurality opinion, *Hernandez* was cited by the Supreme Court in *Ineos* to support its holding that Chapter 95 only applies when the injury results from a condition or use of the same improvement on which the contractor worked when the injury occurred. *Ineos USA, L.L.C.*, 505 S.W.3d at 567. And, in the parenthetical following citation to *Hernandez*, the Supreme Court indicated that it read *Hernandez* as "holding that Chapter 95 did not apply because the injury arose from a different improvement than the one the plaintiff was repairing." *Id.*; *see Cox v. Air Liquide Am.*, 498 S.W.3d 686, 690 (Tex. App.–Houston [14th Dist.] 2016, no pet.) (stating that the Supreme Court "cited approvingly" to *Hernandez* in *Ineos)*.

Obviously, we have no quarrel with the Supreme Court's statement in *Ineos* that Chapter 95 applies when the injury results from a condition or use of the "same" improvement on which the contractor worked when the injury occurred. Indeed, the statute itself so provides when saying that the chapter applies to a claim "that arises from the condition or use of an improvement . . . where the contractor or subcontractor constructs . . . the improvement." TEX. CIV. PRAC. & REM. CODE ANN. § 95.002(2) (emphasis added). The word "the" no doubt refers to a condition or use of the actual improvement being constructed, repaired, or modified in some way. And, to the extent that the plurality in *Hernandez* said the same, its statement is equally correct.

Yet, missing from *Ineos* is any expression by the Supreme Court that it approved of the manner in which the plurality applied the legal principle to the actual facts in *Hernandez*. It is one thing to say that the opinion correctly interpreted the statute, but quite another to say that it correctly applied that interpretation. The latter went unsaid in *Ineos*. And, whether the omission by the Supreme Court was intentional or not, we hesitate to read it into the opinion. This is so because the *Ineos* court, like the *Abutahoun* court, read the word "improvement" as having a broad reach or definition. *Ineos USA, L.L.C.*, 505 S.W.3d at 568. And, in so broadly defining the word, it concluded that the system *in toto* with all its different or separable components comprised the improvement, not just that separate component on which Elmgren worked.

Obviously, the plurality in *Hernandez* did not have the benefit of either *Abutahoun* or *Ineos*. Had it, we wonder whether the outcome would have been the same. And why we wonder begins with the observation that the air conditioner being serviced in *Hernandez* needed a foundation on which to rest for it was not floating. The foundation happened to be the roof, and to complete the work, the repair-

man necessarily had to walk atop that roof. To say that the air conditioner's foundation is not a part of the air conditioner is to ignore the interrelationship between the air conditioner and its physical and geographic surroundings.[1] And, that is what *Ineos* and *Abutahoun* warned against.

Moreover, we avoided the temptation to divorce the nature of the work being done or item being repaired from its surroundings in our recent decision in *Wall v. Cypress 9 Holdings, L.L.C.*, No. 07–14–00362–CV, 2016 WL 3019568, 2016 Tex. App. LEXIS 5417 (Tex. App.–Amarillo May 23, 2016 no pet.) (mem. op.). There, Wall was assigned the task of hanging Christmas decorations on the exterior of a residence and by a window. He attempted to access the location through the attic and in doing so fell through a portion of the attic's flooring located near the window. Upon acknowledging *Abutahoun* and its holding, we concluded that Chapter 95 controlled his claim. *Id.* at *4, 2016, Tex. App. LEXIS 5417 at *10. In other words, the juxtaposition between the work being done, where that work was being done, and the point of injury rendered the point of injury a part of the improvement. *Id.*; *see, e.g., Covarrubias v. Diamond Shamrock Ref. Co., LP*, 359 S.W.3d 298, 300–303 (Tex. App.–San Antonio 2012, no pet.) (hydrocarbons released when scissor-lift that the contractor was using to access his work space hit a fitting that was not the object of his work); *Clark v. Ron Bassinger, Inc.*, No. 07–03–00291–CV, 2006 WL 229901, at *2, 2006 Tex. App. LEXIS 795, at *5–6 (Tex. App.–Amarillo Jan. 31, 2006, no pet.) (mem. op.) (skylight was not the object of the employee's work, but it was an unsafe part of his workplace); *Fisher v.*

*Lee & Chang Partnership*, 16 S.W.3d 198, 202 (Tex. App.–Houston [1st Dist.] 2000, pet. denied) (ladder provided a means for the contractor to reach his work site and the injury stemmed from a failure to provide a safe workplace); *see also Gorman v. Ngo H. Meng*, 335 S.W.3d 797, 805–06 (Tex. App.–Dallas 2011, no pet.) (referring to the plurality opinion in *Hernandez*, 285 S.W.3d 152, as "a departure from the existing case law of other intermediate courts of appeals").

█ So viewing the nature of an improvement also comports with the intent and wording of Chapter 95. As we noted in *Clark v. Ron Bassinger, Inc.*, 2006 WL 229901, at *2, 2006 Tex. App. LEXIS 795, at *5–6 (wherein Clark fell through the roof of an edifice on which he was retained to complete a plumbing project), the statute contained more than one part. That is, while § 95.002 described how the Chapter pertained to injuries arising from the condition of an improvement where the contractor constructs or modifies the improvement, § 95.003 stated that the property owner is not liable for " 'injury . . . arising from the failure to provide *a safe workplace*,'" unless the property owner retained some control over the way the work was performed and had actual knowledge of the danger or condition resulting in injury. *Id.* (emphasis added); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 95.003 (stating that a "property owner is not liable for personal injury . . . to a . . . subcontractor, or an employee of a . . . subcontractor who constructs, repairs, renovates, or modifies an improvement . . . arising from the failure to provide a safe workplace unless: (1) the property owner exercises or retains some control over the manner in which the

---

1. This is not to say that the entire roof must be considered part of the foundation or "improvement" known as the air conditioner. We can see a scenario where the interrelationship between the air conditioner, its surroundings and the point of injury becomes too attenuated.

work is performed ... and (2) the property owner had actual knowledge of the danger or condition ... and failed to adequately warn"). Because all the words of a statute must be afforded meaning, *Smith v. City of Lubbock*, 351 S.W.3d 584, 586 (Tex. App.–Amarillo 2011, pet. denied), and the legislative intent underlying it generally must be derived from reading the statute as a whole, *id.* we could not but factor the concept of "a safe workplace" into the nature of the improvement.

■ In other words, mentioning that the owner is not liable for injury arising from the failure to provide a "safe workplace" indicates that the legislature had in mind the actual workplace. And because all the words of a statute must be read in harmony if possible, *id.* the nature of the workplace must be factored into the broad definition of improvement. As we said in *Ron Bassinger*, "Clark was engaged in the construction of an improvement to real property" and "[h]is [plumbing] duties required him to work on the roof." *Clark v. Ron Bassinger, Inc.*, 2006 WL 229901, at *2, 2006 Tex. App. LEXIS 795, at *6. So, while the improvement being completed involved plumbing, the workplace at which that plumbing was to occur was the roof. So, in effect, the location at which the improvement was to be completed was factored into the scope of the improvement. We see no reason why this should not be so. We see no reason why the condition of the workplace should not be factored into the improvement or at least deemed a condition of the improvement for it reveals an aspect of the improvement's state of being. An air conditioner found atop a rotting roof surely affects the repair of that air conditioner. The roof is part of the workplace at which the repairs are performed. If rotting around the air conditioner, it reflects the air conditioner's state of being that must be encountered in com-

pleting the repairs. And, no one can deny that the legislature intended the Chapter to encompass injury "that arises from the **condition** ... of an improvement." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 95.002(2) (emphasis added).

No less is true of electrical lines found hovering within contact of the actual improvement. They too have been deemed conditions of the area or object being improved, as illustrated in *Corpus v. K–J Oil Co.*, 720 S.W.2d 672 (Tex. App.–Austin 1986, writ ref'd n.r.e.). There, a well service company was hired to rework a well. Pablo Corpus, who appeared at the well site on behalf of the service company, happened to be pulling metal horses off the "work-over rig" to be used in completing the job when a fellow employee backed the rig into an electrified power line. *Id.* at 674. The contact apparently caused electricity to travel down the line through the rig and into the metal horse being handled by Corpus. *Id.* The latter sued the well owner, K–J, for damages caused by the resulting shock and alleged a theory of recovery sounding in premises liability, among others. Regarding the claim, Corpus argued that K–J owed him (an invitee) the duty to warn of dangerous conditions. An implicit component of the argument was the notion that the electrified power line over the well site was both a condition of the well site and a dangerous one about which K–J had to warn. In sustaining the trial court's summary judgment against Corpus on the premises claim, the appellate court said: "[t]he highline, as constructed, did not become dangerous to those working below until the foreman ... caused the work-over rig's boom to come in contact or close proximity with the highline." *Id.* It further observed that "[t]he highline plainly was not a hidden danger on the premises (one not reasonably apparent)" and "photographs of the 'B–2' well site, attached to the motion for sum-

mary judgment, show an ordinary overhead highline." *Id.* It being readily visible, K–J had no duty to warn of the condition.

Admittedly, *Corpus* did not involve Chapter 95, but it did involve a premises being repaired or modified (i.e. the well site), and the presence of the power line was deemed a condition of the site at the time of injury despite the fact that it hung overhead. *See Brookshire Grocery Co. v. Taylor*, 222 S.W.3d 406, 407 (Tex. 2006) (stating that an unreasonably dangerous condition for which a premises owner may be liable is the condition at the time and place the injury occurs). Moreover, Torres' own pleadings appear to concede that here.

As previously mentioned, one of his causes of action sounded in premises liability. To support the claim, he averred that Mueller failed to properly warn the concrete finishers of the dangerous condition existing on Defendants' work site, which ultimately caused him to suffer severe electrical burns. The "dangerous condition" consisted of an energized, overhead main electric utility line that was too close to the work area. In so averring, he necessarily concedes that the overhead power line was a condition of the work area. That work area also happened to be the improvement (i.e. parking lot) on which he worked. The line's presence had to be factored into the manner in which he performed his work at that spot; indeed, he experienced the result of not factoring it into the equation. Under those circumstances, we cannot but conceive the power line as an aspect of the improvement's state of being or as a condition of the improvement. That being said, we view his injuries as arising from a condition of the improvement on which he worked.

Chapter 95 applies here. Thus, its tenets regulate the viability of each claim Torres alleged that involved negligence, that is,

his claims of active negligence, premises liability, and gross negligence. *Abutahoun v. Dow Chem. Co., supra* (holding that the Chapter encompasses all forms of negligence claims); *see Jannette v. Deprez*, 701 S.W.2d 56, 60 (Tex. App.–Dallas 1985, writ ref'd n.r.e.) (stating that "gross negligence as one type of negligence, which is distinguished from ordinary negligence by adding to the element of lack of care the defendant's 'conscious indifference' to the welfare and safety of others").

Because the Chapter applies, we now turn to the aforementioned hurdles found in § 95.003(1) of the statute. Again, the provision states that the property owner "is not liable" for injury arising from the failure to "provide a safe workplace unless" the owner 1) exercised or retained some control over the manner in which the work is performed (excluding the retention of the right to order the work to start or stop, to inspect progress, and receive reports) and 2) had actual knowledge of the danger or condition resulting in the personal injury and failed to adequately warn of it. *Id.* § 95.003(1) & (2). Evidence establishing a material issue of fact regarding both prongs must appear of record before we can conclude that the trial court erred in granting summary judgment.

■ As for the first part of the test, the control element is not satisfied simply through proof that the property owner had control of the facilities. *Vanderbeek v. San Jacinto Methodist Hosp.*, 246 S.W.3d 346, 352 (Tex. App.–Houston [14th Dist.] 2008, no pet.). Rather, he "must have the right to control the means, methods, or details of the independent contractor's work to the extent that the independent contractor is not entirely free to do the work his own way." *Abarca v. Scott Morgan Residential, Inc.*, 305 S.W.3d 110, 123 (Tex. App.–Houston [1st Dist.] 2009, pet. denied). This level of control is a mere iteration of the control

required by our common law when one attempts to impose liability upon a property owner for injuries suffered by a subcontractor.

Under that common law standard, the property owner has no duty to ensure that an independent contractor safely performs its work. *Koch Ref. Co. v. Chapa*, 11 S.W.3d 153, 155 (Tex. 1999). Yet, the independent contractor or its employee "can recover ... for ... negligence if the owner exercised some control over the relevant work and either knew or reasonably should have known of the risk or danger." *Ineos USA, L.L.C*, 505 S.W.3d at 561. And, as described in *Abarca* and *Vanderbeek*, the type of control needed is more than a general right to order the work stopped or started, to inspect its progress or to receive reports, to make suggestions or recommendations which may be ignored, or to prescribe alterations and deviations in the work. *Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 791–92 (Tex. 2006). In other words, the property owner becomes liable only if he controls the details or methods of the independent contractor's work to such an extent that the contractor cannot perform the work as it chooses. *Id.*

The summary judgment evidence here illustrated that Mueller (the Owner) and A & S (the Contractor) executed a contract regarding the construction of the facility. It provided that:

§ 9.2.1 The Contractor shall supervise and direct the Work, using the Contractor's best skill and attention. The Contractor shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures, and for coordinating all portions of the Work under the Contract, unless the Contract Documents give other specific instructions concerning these matters[;]

§ 9.2.2 The Contractor shall be responsible to the Owner for acts and omissions of the Contractor's employees, Subcontractors and their agents and employees, and other persons or entities performing portions of the Work for or on behalf of the Contractor or any of its Subcontractors[;]

§ 9.3.1 Unless otherwise provided in the Contract Documents, the Contractor shall provide and pay for labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation, and other facilities and services necessary for proper execution and completion of the Work whether temporary or permanent and whether or not incorporated or to be incorporated in the Work[;]

§ 9.3.2 The Contractor shall enforce strict discipline and good order among the Contractor's employees and other persons carrying out the Work. The Contractor shall not permit employment of unfit persons or persons not skilled in tasks assigned to them[;]

\* \* \* \* \*

§ 9.6.2 The Contractor shall comply with and give notices required by applicable laws, statutes, ordinances, codes, rules and regulations, and lawful orders of public authorities applicable to performance of the Work. If the Contractor performs Work knowing it to be contrary to applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders of public authorities, the Contractor shall assume appropriate responsibility for such Work and shall bear the costs attributable to correction[;]

\* \* \* \* \*

§ 11.3 Contracts between the Contractor and Subcontractors shall (1) require each Subcontractor, to the extent of the

Work to be performed by the Subcontractor, to be bound to the Contractor by the terms of the Contract Documents, and to assume toward the Contractor all the obligations and responsibilities, including the responsibility for safety of the Subcontractor's Work, which the Contractor, by the Contract Documents, assumes toward the Owner and Architect, and (2) allow the Subcontractor the benefit of all rights, remedies and redress against the Contractor that the Contractor, by these Contract Documents, has against the Owner[;]

\* \* \* \* \*

§ 16.1 The Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the performance of the Contract. The Contractor shall take reasonable precautions for safety of, and shall provide reasonable protection to prevent damage, injury or loss to

.1 employees on the Work and other persons who may be affected thereby;

.2 the Work and materials and equipment to be incorporated therein, whether in storage on or off the site, under care, custody or control of the Contractor or the Contractor's Subcontractors or Sub-subcontractors; and

.3 other property at the site or adjacent thereto, such as trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction[; and]

The Contractor shall comply with and give notices required by applicable laws, statutes, ordinances, codes, rules and regulations, and lawful orders of public authorities bearing on safety of persons and property and their protection from damage, injury or loss.

These contractual provisions illustrate that Mueller retained no contractual right to control the details of performance by any subcontractors, of even the contractor, i.e. A & S. As for the possibility that it actually exercised such control despite the absence of a contractual right to do so, we find the following evidence of record. Mueller had no employees at the jobsite when the accident occurred. One arrived later, though. Furthermore, the Mueller representative assigned to monitor the work (i.e. Mansell) was in Alaska at the time. Brian Alvey of A & S, also, attested that Mansell's presence at the site on other occasions consisted of his appearing twice a month for "a couple of hours" each time.

Regarding the nature of Mansell's tasks, the evidence indicated that he was responsible for coordinating the development and monitoring the progress of the building project. His duties consisted of "obtaining land, closing properties, hiring engineers, negotiating rezoning, taking care of platting, hiring firms to perform geotechnical studies, taking construction bids, and hiring general contractors." Much of his time was spent during the preconstruction phase of the project and involved "meeting with the planning and zoning board, platting the property, finalizing architectural and landscaping plans." Once actual construction began, "the majority of [his] communication regarding the project was done by telephone with [Brian] Alvey [of A & S.]"

In addition to describing the various duties he performed, he also denied "exercis[ing] control over the manner, means, methods, techniques, sequences, procedures, and/or coordinating of the work being performed by workers employed by A & S or its subcontractors." So too did he deny giving " 'any of these workers any instructions on how to do their work.' "

And, as for the "placement" of the electrical lines, neither Mueller nor Mansell were responsible for that. Apparently, the lines belonged to an electrical utility named "Oncor."

Also of record is the deposition testimony of Torres. Relevant excerpts of it purport to describe the control exercised by Mueller. They consist of Torres describing how Brian Alvey and some individuals from Mueller saying such things as "[y]ou're going to pour this cement," and "[e]verybody do your particular job." According to Torres, "[t]he people from Mueller and Brian told us to pour the concrete," though "[t]hey didn't tell it to me personally." Torres also stated that 1) "I was just doing the job I was supposed to," 2) no one told him to use the "mapa" or bull float since he simply knew he was supposed to use it, 3) "the people from Mueller told us to do that job [i.e. pour the concrete], so I was just doing it over there," 4) "[t]hey came over to the group I was with, and they said 'You're going to pour this cement,'" and 5) they said "[e]verybody do your particular job" and "pour the cement over on this part and do a good job, and that was all." Yet, questioning of Torres also revealed that he had no personal knowledge of the identity of those with Brian Alvey. Rather, he believed them to be representatives of Mueller because one of his coworkers said they were.

For purposes of this appeal, we assume *arguendo* that Torres' comments about the identity of the men with Brian on the morning of the accident were competent evidence despite his lack of personal knowledge about same and their general hearsay nature. So too do we construe them in a light most favorable to Torres. Yet, in our doing so, they nevertheless fail to evince that Mueller controlled the details or methods of the subcontractor's work to such an extent that the subcon-

tractor could not perform the work as it chose. For instance, they do not show that Mueller or Mansell told Torres and his coworkers how to do their job, what tools to use, when to use certain tools, how to use any tools, how to mix the concrete, how to surface concrete, or how to do anything else. The supposed Mueller personnel at the site simply told him of what his job consisted, when to do it, and to do it well. To reiterate what Torres said, it was his job, and he knew what tool to use.

Being told what one's job is and to go do it is far different than being told how to do one's job. It is the latter form of conduct that evinces the type of control needed to impose liability upon a property owner, not the former. Again, the control contemplated is that exercised over the " 'manner in which the subcontractor's work [is] performed.' " *R.R. Street & Co. v. Pilgrim Enters.*, 166 S.W.3d 232, 243 (Tex. 2005), quoting *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (2002). The subcontractor "must be 'controlled as to his methods of work, or as to operative detail.' " *Id.* quoting *Koch Refining Co.*, 11 S.W.3d at 155. What Torres described here is not that.

Nor does the evidence presented by Mueller and Mansell illustrate the requisite control. Mansell monitored the project and appeared responsible for completing the measures needed to get it started and finished like finalizing design plans, securing zoning approval and hiring architects and other personnel or businesses to finish the project. He did not tell others how to do their jobs, though.

Nor did the affidavit of one of Torres' coworkers supply the missing evidence. The affidavit to which we refer is that of Antonio Lopez. Therein, he stated that "[Mueller] was in charge of the work-site." What he meant by "in charge" went unmentioned. Also unmentioned is the evidence from which he derived his conclu-

sion. Consequently, the observation is nothing more than a conclusory opinion bereft of evidentiary value. *See In re Lipsky*, 460 S.W.3d 579, 592–93 (Tex. 2015) (stating that "[b]are, baseless opinions do not create fact questions" and "[o]pinions must be based on demonstrable facts and a reasoned basis").

■ In sum, the evidence of purported control exercised by Mueller and Mansell is not of the ilk required by *R.R. Street, Fifth Club, Koch, Abarca,* or *Vanderbeek.* Without the requisite evidence of control, the first hurdle of Chapter 95 was not cleared, and it becomes unnecessary to assess whether the second one was. So, the trial court did not err in granting summary judgment.

### Joint Enterprise

Torres also attempted to impute negligence to Mueller via the theory of joint enterprise. That is, he believed the liability of A & S should be imputed to Mueller because they were engaged in a joint venture. Mueller attempted to disprove the claim via the motion for summary judgment by arguing that one element underlying the claim was nonexistent. The element in question was that pertaining to the existence of an agreement to share profits and losses. *See Ayco Dev. Corp. v. G.E.T. Serv. Co.*, 616 S.W.2d 184, 186 (Tex. 1981) (stating that a "joint venture must include these four elements: a community of interest in the venture; an agreement to share profits; an agreement to share losses; and, a mutual right of control or management of the enterprise"). Furthermore, Mueller presented evidence that no such agreement existed. We find neither evidence disputing that presented by Mueller nor argument asserted by Torres attempting to attack this aspect of the summary judgment. Thus, we let stand the trial court's decision to reject the claim.

### Continuance

■ Next, we address Torres' complaint regarding the trial court's decision to deny him a continuance. He sought one to gather additional evidence to show that Mueller knew of the electrical lines' existence and took no action to protect against the danger posed.

■ As previously mentioned, the standard of review is that described in *Joe v. Two Thirty Nine Joint Venture,* and it involves whether or not the trial court abused its discretion in deciding as it did. *Joe v. Two Thirty Nine Joint Venture,* 145 S.W.3d at 161. And, in resolving that matter, various nonexclusive factors are considered. They include the length of time the case has been on file, the materiality and purpose of the discovery sought, and whether the party seeking the continuance had exercised due diligence in attempting to obtain the desired discovery. *Id.*

The record discloses that Torres initiated his suit in November of 2011. Mueller's second amended motion for summary judgment (that is, the motion upon which the trial court acted) was filed about three and one-half years later in July of 2015. The motion for continuance appeared at the end of Torres' response to Mueller's request for summary judgment, which response was filed in August of 2015.

To justify the need for the continuance, his attorney described how he "recently identified a witness" to an accident involving the electrical lines on Mueller's premises. This accident allegedly occurred two weeks before that of Torres and involved a dump truck backing into the lines. Yet, the identity of the witness went unmentioned, as did the substance of his testimony. Nor did the attorney disclose the date on which the witness was "recently" discovered. Whether this recently discovered person was the only witness to the prior incident

also went unmentioned, as did the date on which the attorney discovered the supposed prior accident. Similarly missing from the attorney's rather conclusory affidavit is a description of his efforts to discover the witness's identity and obtain his testimony.

Moreover, Torres desired the alleged evidence because it would assist him in satisfying the second hurdle of § 95.003. Yet, garnering such evidence would be unnecessary if the first hurdle could not be cleared, and, as discussed above, he could not clear it.

Given that the suit had pended for about three and one-half years before Torres moved for a continuance, the meager data provided by his attorney in support thereof, and the questionable materiality of the data in view of the deficient evidence relating to other elements of Torres' claim, we cannot say that the trial court abused its discretion by refusing to further delay disposition of the proceeding.

### Mueller's Appeal

Finally, we come to Mueller's effort at an appeal. It contended that the trial court erred by failing to modify its judgment and sustain its objections to Torres' summary judgment evidence. Due to our disposition of Torres' appeal, though, its complaints need not be addressed.

Accordingly, we affirm the judgment of the trial court.