# IN THE SUPREME COURT OF TEXAS

No. 19-0643

LOS COMPADRES PESCADORES, L.L.C., PETITIONER,

v.

JUAN G. VALDEZ AND ALFREDO TERAN, RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS

**Argued October 29, 2020**

JUSTICE BOYD delivered the opinion of the Court.

This case involves a property owner's liability for injuries its contractor's employees sustained while working on the property. A jury found the property owner liable under both ordinary-negligence and premises-liability theories. The trial court entered judgment for the employees based on those findings, and the court of appeals affirmed. The property owner challenges the judgment on the grounds that the employees failed to submit legally sufficient evidence and failed to obtain jury findings necessary to establish liability, particularly as required under chapter 95 of the Texas Civil Practice and Remedies Code. In response, the employees contend that chapter 95 does not apply, the property owner waived some of its arguments, and the evidence sufficiently supports the jury's verdict. We hold that chapter 95 applies, but we agree with the employees that they nevertheless established their claim, and we therefore affirm the court of appeals' judgment.

# I.
# Background

Juan Valdez and Alfredo Teran were injured while working on the construction of a four-unit condominium building on South Padre Island. Los Compadres Pescadores,[1] L.L.C., owned the property and intended to lease the condos as residential apartments. Instead of hiring a general contractor, Los Compadres hired Luis Martin Torres to manage and supervise the project.

The sandy nature of the island's soil required that the building's foundation be constructed on concrete pilings buried deep into the ground below. Based on a bid Torres obtained, Los Compadres contracted Luis Paredes, Jr., d/b/a Paredes Power Drilling, to construct the pilings. Valdez and Teran were working for Paredes when they were injured.

The process Paredes used to install the concrete pilings required that he (1) level and compact fill dirt that had been brought onto the property, (2) drill a hole twenty-five feet deep for each of the more than twenty required pilings, (3) fill each hole with concrete, and (4) insert long metal reinforcement rods, commonly known as rebar, into each hole before the concrete dried. Before Paredes began his work, Los Compadres hired another subcontractor to build a retaining wall along the back of the property line so that the fill dirt could be added. After leveling and compacting the fill dirt for the Los Compadres project, Paredes used a crane with a fifty-foot-high boom and a special drill bit that simultaneously pulled the dirt out and poured the concrete in as he was drilling, combining the second and third steps into one. After drilling and filling one hole, he and his crew would insert the rebar into the wet concrete before moving on to the next.

---

[1] "The Fishing Buddies."

AEP Texas Central Company owned a high-voltage power line that hung about twenty-two to twenty-four feet above and along Los Compadres's back property line. Although one of the poles supporting the power line leaned eight or nine degrees toward the Los Compadres property, the line remained within AEP's eight-foot utility easement and met the applicable code requirements governing its height and location. However, because of the retaining wall along the back property line and the added fill dirt, the ground level was closer to the power line when Paredes started drilling than it had been before construction began.

Paredes knew about the power line, and he told Torres when he bid on the project that Torres needed to "do something about" it because it was "too close" to the worksite. Torres replied that he would talk to AEP and "take care of it." When the time came for Paredes to begin his work, however, the line remained in place. When Paredes asked Torres about it, Torres told him to "go ahead" with his work but to start drilling at the front of the property because "it wasn't clear to see what was going to be done with that [power] line." Paredes began the job as Torres instructed, but warned his crew to stay at least twenty feet away from the line.

On most similar jobs, Paredes would start drilling holes and pouring pilings at the back of the property and move toward the front, to limit the number of times he would have to move the large crane across the compacted fill dirt. At Torres's instruction, however, he began drilling at the front of the Los Compadres property and completed about five pilings the first day. On the second day, Torres told him the power line was still energized and he needed to work around it, so he completed additional pilings toward the front and sides of the property. On the third day, Torres told Paredes that the power line would not be de-energized but Paredes needed to continue drilling because the work had to be done.

3

After drilling about three holes that day, Paredes drilled another hole about ten to twelve feet from the back property line. Paredes drilled and filled that hole at a slight angle to keep the crane's boom as far away from the power line as possible, and then got down from the crane to help his crew insert the rebar. Each piece of rebar was over twenty feet long and weighed over one hundred pounds, requiring the men to work together to lift and lower it into the concrete. No one knows exactly what happened to cause the accident, but as Valdez, Teran, Paredes, and another crew member were lifting the rebar and placing one end into the concrete, the other end contacted the power line.

The electricity shot down the rebar, threw the men off their feet, briefly knocked them unconscious, and caused burns to their hands and feet. The power line snapped, and the rebar was left leaning on a telecommunications line strung below the power line. Although the power line carried over seven thousand volts, the lower end of the rebar was already in contact with the concrete before the higher end contacted the power line, grounding the circuit and likely saving the men's lives. After taking a day off, Paredes returned and finished the job. Los Compadres later paid him to bury conduit along the back property line so that AEP could move the power line underground.

Valdez and Teran sued AEP and Paredes for negligence.[2] Paredes filed a cross-claim against AEP for negligence as well. AEP then joined Los Compadres as a third-party defendant, arguing that chapter 752 of the Health and Safety Code required Los Compadres to indemnify AEP

---

[2] Valdez and Teran also sued Luis Paredes, Sr., d/b/a Paredes Construction Company, who had constructed the property's retaining wall before the younger Paredes began compacting the fill dirt. The trial court granted the elder Paredes and his company summary judgment, and Valdez and Teran do not challenge that decision.

because Los Compadres had violated the Code's provisions.[3] Valdez and Teran then added ordinary-negligence and premises-liability claims against Los Compadres.[4]

AEP settled with Valdez and Teran before trial but continued to pursue its statutory-indemnity claim against Los Compadres. The jury found that Los Compadres, Paredes, and AEP each negligently caused the occurrence but Valdez and Teran did not. The jury also found Los Compadres liable under a premises-liability theory, specifically finding that Los Compadres exercised or retained some control over the manner in which the injury-causing work was performed. The jury assigned 50% of the responsibility for the occurrence to Los Compadres, 25% to Paredes, and 25% to AEP. The jury found against AEP on its statutory-indemnity claim, finding Los Compadres did not violate the Health and Safety Code because it was not "responsible for temporary work, activity or function which made it possible to bring tools, equipment, machines or materials within six feet of the power lines." Finally, for pain and mental anguish, the jury awarded Valdez $150,000 and Teran $83,200.

After adding prejudgment interest and applying settlement credits, the trial court entered judgment for Valdez and Teran on the jury's verdict. Los Compadres appealed, and the court of appeals affirmed. *Los Compadres Pescadores, L.L.C. v. Valdez*, 608 S.W.3d 829, 833 (Tex. App.—Corpus Christi–Edinburg 2019). Los Compadres petitioned this Court for review. We requested briefs from the parties, and Los Compadres filed a brief arguing that the jury's findings and the evidence are insufficient to establish that (A) Torres acted as Los Compadres's employee

---

[3] *See* TEX. HEALTH & SAFETY CODE § 752.008 ("If a violation of this chapter results in physical or electrical contact with a high voltage overhead line, the person, firm, corporation, or association that committed the violation is liable to the owner or operator of the line for all damages to the facilities and for all liability that the owner or operator incurs as a result of the contact.").

[4] Valdez also named Los Compadres's individual owners as defendants but later nonsuited them.

or agent, making Los Compadres vicariously liable for Torres's conduct, (B) Los Compadres had actual knowledge of the dangerous condition that resulted in the harm, (C) Los Compadres had control over the work that led to the injuries, (D) Los Compadres failed to warn Valdez and Teran of a dangerous condition that was not "open and obvious," or (E) Los Compadres's conduct proximately caused their injuries. We granted the petition and now affirm.

## II.
## Discussion

### A. Agency

Valdez and Teran pursued their claims against Los Compadres under the respondeat-superior theory that Los Compadres is vicariously liable for Torres's actions. Under this theory, an entity is vicariously liable for its employee's or agent's actions within the scope of employment or agency *because* the entity necessarily has the right to control an employee's or agent's work. *See Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 947 (Tex. 1998). By contrast, an entity is not vicariously liable for an independent contractor's actions *unless* the entity in fact "retains some control over the manner in which the contractor performs the work that causes the damage." *Gonzalez v. Ramirez*, 463 S.W.3d 499, 506 (Tex. 2015) (per curiam). So to hold Los Compadres liable for Torres's actions, Valdez and Teran had to prove that Torres was Los Compadres's employee or agent or that Los Compadres in fact retained the right to control Torres's work. Los Compadres argues it cannot be liable for Torres's actions because Valdez and Teran failed to request or obtain any such finding. Valdez and Teran argue that Los Compadres has waived this argument and even if it hasn't, a jury finding was not required because the evidence conclusively established that Torres was Los Compadres's agent. We agree with Valdez and Teran.

6

### 1. Waiver

Valdez and Teran argue that Los Compadres waived this argument both in the court of appeals and in this Court. We agree.

Los Compadres argued in the court of appeals that Valdez and Teran could not recover under a respondeat-superior theory because they failed to obtain a jury finding on agency. Valdez and Teran argued (as they do here) that a jury finding was unnecessary because the evidence conclusively established that Torres was acting as Los Compadres's agent. *See Los Compadres Pescadores*, 608 S.W.3d at 839 n.11.[5] The court of appeals held that Los Compadres waived the argument because it failed to address Valdez and Teran's contention that the evidence conclusively established the agency relationship. *Id.* at 839. Under these circumstances, we cannot conclude that the court of appeals abused its discretion by finding a briefing waiver. *See Nobility Homes of Tex., Inc. v. Shivers*, 557 S.W.2d 77, 83 (Tex. 1977) (affirming judgment when party failed to challenge a separate and independent ground for recovery).

Moreover, Los Compadres has not briefed Valdez and Teran's agency contention in this Court, nor has it addressed the court of appeals' holding that Los Compadres waived the agency argument in that court. Nor did Los Compadres identify the agency issue, even as an unbriefed issue, in its petition for review. *See* TEX. R. APP. P. 53.2(f) (requiring a petition for review to "state concisely all issues or points presented for review"). Los Compadres notes that it "specifically referenced" the agency issue in its petition for review, but it did so only to argue that the resolution of that issue does not affect whether chapter 95 of the Civil Practice and Remedies Code applies

---

[5] *See also* TEX. R. CIV. P. 279 ("Upon appeal all independent grounds of recovery or of defense not conclusively established under the evidence and no element of which is submitted or requested are waived."); *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 222–23 (Tex. 1992) ("Unless the Bank's affirmative claim is conclusively established under the evidence, the ground of recovery is waived upon appeal.").

to this case. It never "specifically referenced" the issue of whether Valdez and Teran are prevented from arguing vicarious liability because they failed to secure a jury finding. That issue is not fairly included in the petition's sole reference to agency. *See* TEX. R. APP. P. 53.2(f) ("The statement of an issue or point will be treated as covering every subsidiary question that is fairly included.").

We generously construe our rules to avoid finding briefing waiver in this Court. *See, e.g.*, *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 849 (Tex. 2018) ("[A]lthough the issue was presented only briefly in the petition for review, it was nonetheless presented and is therefore properly before us."). But the rules "are not meaningless technicalities that we can ignore at will." *Bradshaw v. Bradshaw*, 555 S.W.3d 539, 558 (Tex. 2018). Under these circumstances, we must agree with Valdez and Teran that Los Compadres waived its argument that their failure to obtain a jury finding on agency prevents them from holding Los Compadres vicariously liable for Torres's conduct.

### 2.     Conclusively established

Even if Los Compadres had not waived its agency argument, we agree with Valdez and Teran that the evidence conclusively established[6] that Torres was Los Compadres's agent or employee because Los Compadres retained the right to control the manner in which Torres performed the work that gave rise to the harmful occurrence. *See Limestone Prods. Distrib., Inc. v. McNamara*, 71 S.W.3d 308, 312 (Tex. 2002) (per curiam) (holding that a common-law determination of whether a person is an employee depends on "whether the employer has the right to control the progress, details, and methods of operations of the work").

---

[6] *See City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005) ("Evidence is conclusive only if reasonable people could not differ in their conclusions . . . .").

8

Paredes testified that although he "worked" for and was paid by Los Compadres, he was "hired" by Torres, who was "working for" Los Compadres, representing Los Compadres on the project, and taking orders from Los Compadres. Torres was the only person Paredes had contact with about decisions regarding the project. Torres was "in charge" of the project; he was the "superintendent" who supervised Paredes and gave him instructions and directions on what to do. Although Los Compadres owned the project, its owners never communicated with Paredes; they communicated only through Torres.

Los Compadres's managing owner, Raul Medina, testified at his pretrial deposition that Torres "was our employee," but at trial he said he was mistaken about that because Los Compadres had reported Torres's compensation using 1099 forms instead of W-2 forms, which suggests he was an independent contractor.[7] But Medina also testified that Los Compadres "hired" Torres and paid him a salary to work as the project manager and supervisor—a position responsible for soliciting bids, making sure the job was run timely, making sure all materials arrived at the worksite, and confirming that the contractors completed their jobs before Los Compadres paid them. He acknowledged that Los Compadres authorized Torres to sign the project's building permit as the "owner" or "agent of the owner." And Los Compadres's own expert witness testified, based on his review of the documents, that Torres "was apparently an employee of" and "acting on behalf of" Los Compadres.

---

[7] *See Limestone Prods.*, 71 S.W.3d at 312 (identifying 1099 reports as a factor to consider when determining whether worker was an employee or independent contractor); *INA of Tex. v. Torres*, 808 S.W.2d 291, 294–95 (Tex. App.—Houston [1st Dist.] 1991, no writ) (holding evidence sufficient to support employee status even though employer reported payment through 1099s).

Based on this evidence, we conclude that reasonable jurors could not differ on the conclusion that Torres acted as Los Compadres's agent or employee with respect to Paredes's work on the condominium project because Los Compadres retained a right to control Torres's conduct in that capacity. *See City of Keller*, 168 S.W.3d at 816. And even if Torres was not an employee of Los Compadres, the evidence establishes that Torres held himself out as Los Compadres's agent. *See Ames v. Great S. Bank*, 672 S.W.2d 447, 450 (Tex. 1984) (citing *Rourke v. Garza*, 530 S.W.2d 794 (Tex. 1975) (noting that when "a principal knowingly permit[s] an agent to hold herself out as having authority" so that "a reasonably prudent person [is led] to believe that the agent has the authority she purports to exercise," the agent "binds a principal as though the principal herself had performed the action taken"); *Biggs v. U.S. Fire Ins. Co.*, 611 S.W.2d 624 (Tex. 1981); *Chastain v. Cooper & Reed*, 257 S.W.2d 422 (Tex. 1953)).

Nor could reasonable jurors differ on the conclusion that, in that capacity, Torres retained control over Paredes's work that led to Valdez's and Teran's injuries. Although Paredes testified that Torres was not physically present at the worksite every day, or even on the day of the accident, Paredes conferred with Torres by telephone to receive instructions, including instructions about the power line. Torres controlled the work that led to the accident because he initially instructed Paredes to work from the front of the property to the back and then instructed him to continue working in the back even though the power line remained energized.

Because the evidence conclusively established that Los Compadres, acting through Torres as its agent, controlled the work that led to the accident and injuries, Valdez's and Teran's failure to secure a jury finding on agency does not prevent them from holding Los Compadres vicariously liable for Torres's conduct, even if Los Compadres had not waived that argument.

10

## B. Chapter 95's applicability

In response to the trial court's premises-liability question, the jury found that Los Compadres "knew or reasonably should have known" about an unreasonably dangerous condition yet failed to adequately warn Valdez and Teran of the condition or make the condition reasonably safe. Under the common law, this finding would make Los Compadres liable for the injuries the dangerous condition caused. *See Ineos USA, LLC v. Elmgren*, 505 S.W.3d 555, 561 (Tex. 2016). Los Compadres contends, however, that the finding is insufficient to support liability here because chapter 95 of the Civil Practice and Remedies Code applies and required Valdez and Teran to prove that Los Compadres had "actual knowledge" of the condition, not just that it "reasonably should have known" about the condition. *Id.*; *see* TEX. CIV. PRAC. & REM. CODE § 95.003(2). We agree with Los Compadres that chapter 95 applies.

Chapter 95 applies to a claim, counterclaim, cross-claim, or third-party claim (1) for damages caused by negligence resulting in personal injury, death, or property damage, (2) asserted against a person or entity that owns real property primarily used for commercial or business purposes (a property owner), (3) asserted by an owner, contractor, or subcontractor or an employee of a contractor or subcontractor, and (4) "that arises from the condition or use of an improvement to real property where the contractor or subcontractor constructs, repairs, renovates, or modifies the improvement." TEX. CIV. PRAC. & REM. CODE §§ 95.001, .002; *Ineos*, 505 S.W.3d at 560–61. The parties agree that the claims asserted here satisfy the first three requirements, but they dispute whether the claims arise from the condition or use of an improvement that Paredes, Valdez, and Teran were constructing, repairing, renovating, or modifying when the injuries occurred.

11

We held in *Ineos* that a claim satisfies the fourth requirement only when the injury results "from a condition or use of the *same improvement* on which the contractor (or its employee) is working when the injury occurs." *Ineos*, 505 S.W.3d at 567 (emphasis added).[8] In *Ineos*, a petrochemical plant employee was injured when heated gas burst from a furnace pipe on which the employee was replacing a valve. *Id.* at 559. We held that the evidence satisfied the fourth requirement even though the gas leak occurred in a pipe valve near a different but connected furnace about 200 feet away. *Id.* at 567. Rejecting the argument that each of the connected furnaces constituted a separate "improvement," we held that the furnaces, "though perhaps 'separate' in a most technical sense," were all part of one single improvement—the "single processing system within a single plant on Ineos' property." *Id.* at 568.

Los Compadres argues that the facts here satisfy the statute's fourth requirement because the power line was a dangerous condition of the "workplace" on which Valdez and Teran were working when they were injured. Because the dangerous condition existed on that workplace, and the rebar that contacted that dangerous condition was part of the foundation being constructed on the workplace, Los Compadres contends the harm here resulted from a condition of the same improvement on which Paredes and his crew were working.[9] Based on chapter 95's express

---

[8] Los Compadres appears to argue that we recently overruled *Ineos* implicitly by holding that chapter 95's fourth requirement "requires only that the claim arise from the use of *an* improvement." *See Endeavor Energy Res., L.P. v. Cuevas* 593 S.W.3d 307, 311 (Tex. 2019) (emphasis added). This argument misreads our holding in *Endeavor*. We held in that case that when a claim "requires proof of two separate negligent acts"—such as a claim for negligent hiring or negligent entrustment—only one of the two negligent acts must involve the use or condition of the improvement from which the claim arises. *Id.* at 311–12. We neither held nor suggested that the harm need not result from the condition or use of the same improvement on which the employee is working when the injury occurs.

[9] Los Compadres relies primarily on a factually similar case in which the court of appeals held that overhead power lines were a condition of a parking lot that constituted the improvement on which the employee was working when he was electrocuted. *See Torres v. Mansell*, 518 S.W.3d 481, 491 (Tex. App.—Amarillo 2017, pet. denied). The court in *Torres* expressly disagreed with the reasoning and holding in *Hernandez v. Brinker International, Inc.*, 285 S.W.3d 152, 157 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (plurality op.), in which the Fourteenth Court of

language, however, we disagree that the statute's fourth requirement is satisfied whenever the injury arises from a dangerous condition of the claimant's "workplace."

A workplace may include several different improvements, and each improvement may possess numerous conditions. Here, the energized power line hanging over the property was certainly a condition of the *premises* that constituted the workplace where the injuries occurred.[10] And, as Los Compadres notes, chapter 95 applies to claims "arising from the failure to provide a safe workplace." TEX. CIV. PRAC. & REM. CODE § 95.003; *see Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 776 (Tex. 2010) ("[P]remises liability encompasses a nonfeasance theory based on the owner's failure to take measures to make the property safe."). But by its express terms, chapter 95 applies only when the workplace is made unsafe by the condition (or use) "of *an improvement* to real property where the contractor or subcontractor constructs, repairs, renovates, or modifies *the improvement*." TEX. CIV. PRAC. & REM. CODE § 95.002(2) (emphases added). For chapter 95 to apply, it is not enough that a dangerous condition existed on the premises on which the claimant was working or created an "unsafe workplace." Instead, the danger must arise from

_____

Appeals held that chapter 95 did not apply because the injury resulted from the dangerous condition of a restaurant's roof, a different improvement than the air-conditioning unit on which the claimant was working, even though the unit was located on the roof.

We cited *Hernandez* in *Ineos* as support for our holding that chapter 95 applies only when the injury results "from a condition or use of the *same improvement* on which the contractor (or its employee) is working when the injury occurs." *Ineos*, 505 S.W.3d at 567 (emphasis added). The *Torres* court reasoned that although we cited *Hernandez* for that holding, we did not expressly or impliedly cite *Hernandez* for its holding that the roof and the air-conditioning unit in that case were not the "same improvement." *See Torres*, 518 S.W.3d at 488–89; *Hernandez*, 285 S.W.3d at 157.

[10] The fact that the power line was energized could also qualify as a dangerous condition *of the power line*. *See, e.g.*, *Sampson v. Univ. of Tex. at Austin*, 500 S.W.3d 380, 391 (Tex. 2016) (noting that an electrical cord that was "frayed with exposed wire that touched Sampson as he walked by, shocking him," would have been an injury caused by the "condition" of the cord). But Valdez and Teran were not constructing, repairing, renovating, or modifying *the power line* when they were injured, and the power line was not part of the piling, foundation, or building they were constructing.

13

the condition (or use) of "an improvement" within the workplace on which the claimant was working. *Id.*

An improvement is any addition to real property, other than fixtures, that can be removed without causing injury to the real property. *Abutahoun v. Dow Chem. Co.*, 463 S.W.3d 42, 49 (Tex. 2015) (quoting *Sonnier v. Chisholm–Ryder Co.*, 909 S.W.2d 475, 479 (Tex. 1995)). The question is how broadly to define the "improvement" as chapter 95 uses that term. *Ineos*, 505 S.W.3d at 568. Each piling Valdez and Teran installed on the premises could constitute an improvement to the real property. To the extent the pilings were part of the building's foundation, the foundation itself, including the pilings, could be considered a single improvement. And in the broadest sense, the entire condominium building could be considered a single improvement of which the foundation and its pilings were a part. *See id.* (holding connected furnaces were part of a single improvement—the "single processing system within a single plant on Ineos' property"). Here, Valdez and Teran were part of a crew that was hired to construct only the pilings, not the foundation or the building. That fact would suggest that we define the improvement narrowly, to include only the pilings, because the statute requires that the injury arise from the condition or use of the improvement that the contractor or subcontractor "constructs, repairs, renovates, or modifies." TEX. CIV. PRAC. & REM. CODE § 95.002(2). And, in fact, Paredes and his crew constructed only the pilings, not the foundation or the building.

The characterization of the "improvement" is especially difficult in cases alleging failure to maintain a safe "workplace." Before *Ineos*, several courts of appeals reasoned that chapter 95 "does not require that the defective condition be the object of the contractor's work" as long as the injury arose from a condition of the "workplace." *See, e.g.*, *Fisher v. Lee & Chang P'ship*, 16

14

S.W.3d 198, 201 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) ("The ladder was an unsafe part of appellant's workplace, and his injury arose from the failure to provide a safe workplace."), *disapproved of on other grounds by Ineos*, 505 S.W.3d 555; *see also Clark v. Ron Bassinger, Inc.*, No. 07-03-0291-CV, 2006 WL 229901, at *2 (Tex. App.—Amarillo Jan. 31, 2006, no pet.) (mem. op.) ("[A]lthough the covered skylight opening was not the object of Clark's work, it was an unsafe part of his workplace and his injury arose from the failure to provide him a safe workplace."). Relying on *Torres*, Los Compadres argues that "the nature of the workplace must be factored into the broad definition of improvement." *Torres*, 518 S.W.3d at 490. Based on this approach, Los Compadres contends the entire workplace constitutes the "improvement" on which Valdez and Teran were working when they were injured.

We reject that argument because chapter 95's fourth requirement requires that the injury arise from a condition (or use) of an "improvement," an improvement is an "addition to real property," and a "workplace"—in the sense Los Compadres uses that term—is not an "addition to real property." *See Abutahoun*, 463 S.W.3d at 49. A workplace, at least as Los Compadres uses that term, is merely the location in which a worker constructs an improvement. Defining "improvement" to include the entire workplace would negate the statute's explicit, limited applicability to injuries "that arise[] from the condition or use of *an improvement* to real property." TEX. CIV. PRAC. & REM. CODE § 95.002(2) (emphasis added). The question, then, is not whether the power line was a dangerous condition of the premises or the workplace, but whether it was a dangerous condition of the *improvement* on which Valdez and Teran were working when they were injured.

We have defined "condition" as "an intentional or an inadvertent state of being." *Abutahoun*, 463 S.W.3d at 49 (quoting *Sparkman v. Maxwell*, 519 S.W.2d 852, 858 (Tex. 1975) (holding that whether a new traffic signal caused confusion was a dispute over the signal's "condition")). We have also recognized that items laying on or hanging over real property can create or constitute a condition of the premises. *See, e.g.*, *Sampson*, 500 S.W.3d at 390 (holding dangerous condition was created by "the way the extension cord was positioned over the concrete retaining wall, resulting in a gap between the ground and the cord"); *Univ. of Tex. at Austin v. Hayes*, 327 S.W.3d 113, 117 (Tex. 2010) (per curiam) (holding metal chain hanging across driveway created a dangerous condition of the "location"); *Univ. of Tex.–Pan Am. v. Aguilar*, 251 S.W.3d 511, 512 (Tex. 2008) (per curiam) (holding water hose laying across sidewalk created dangerous condition of the sidewalk). Certainly, an energized power line can create or constitute a condition of the premises over which it hangs. *See Schley v. Structural Metals, Inc.*, 595 S.W.2d 572, 586 (Tex. App.—Waco 1979, writ ref'd n.r.e.) (holding uninsulated power lines hanging over road created dangerous condition of the premises).

But to constitute a condition of the improvement on which Valdez and Teran were working when they were injured, the power lines had to affect the "state of being" of the pilings they were hired to construct. *See Sparkman*, 519 S.W.2d at 858. If, for example, Los Compadres had been constructing the same, relatively small four-unit condominium building on a large tract and the power line was located hundreds of yards from the pilings Valdez and Teran were constructing, the power line might have created a dangerous condition of the premises, but it could not have constituted a condition of the piling, or even of the foundation, or the building. Whether the power

16

line constituted a dangerous condition of the piling necessarily depends on the piling's proximity to the power line.[11]

Here, the evidence establishes that Valdez and Teran were injured while constructing the piling in an ordinary manner, in accordance with the process Paredes regularly used for such projects. After drilling a twenty-five-foot hole and filing it with concrete, the crew lifted and raised a twenty-five-foot rebar to insert it into the hole. After the lower tip of the rebar contacted the concrete, the upper tip contacted the power line. Before construction began, the power line hung twenty-two to twenty-four feet above the ground and ten to twelve feet away from the piling hole. But before Paredes began his work, Los Compadres constructed a retaining wall and added fill dirt to the property, significantly raising the ground level and decreasing that distance, at least enough that the rebar was able to contact the concrete and the power line simultaneously.

If a dangerous condition, by reason of its proximity to an improvement, creates a probability of harm to one who "constructs, repairs, renovates, or modifies" the improvement in an ordinary manner, it constitutes a condition of the improvement itself. TEX. CIV. PRAC. & REM. CODE § 95.002(2). Under these facts—in which the plaintiffs were directly exposed to the dangerous condition because of its close proximity to the improvement on which they were working—we conclude that the energized power line created a dangerous condition of the piling itself. *See Jezek v. City of Midland*, 605 S.W.2d 544, 547 (Tex. 1980) (holding that a dangerous condition that is "not . . . confined to the street itself" may constitute a dangerous condition of the

---

[11] *See, e.g.*, *Sun Oil Co. v. Massey*, 594 S.W.2d 125, 128 (Tex. App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.) (holding presence of energized, uninsulated power lines "close to" oil well on which plaintiff was working constituted a "dangerous condition"); *Hill v. Dall. Ry. & Terminal Co.*, 235 S.W.2d 522, 526 (Tex. App.—Dallas 1950, writ ref'd n.r.e.) (holding telephone pole's close proximity to power line created dangerous condition of the telephone pole); *City of Weatherford Water, Light & Ice Co. v. Veit*, 196 S.W. 986, 992 (Tex. App.—Fort Worth 1917, writ dism'd) (same).

17

street if the condition, "by reason of its proximity to the street," renders it "not improbable" that "those using the street in the ordinary manner" will be injured). Chapter 95 therefore applies and required Valdez and Teran to prove that Los Compadres had actual knowledge of the dangerous condition and controlled Paredes's work. *See* TEX. CIV. PRAC. & REM. CODE § 95.003; *Abutahoun*, 463 S.W.3d at 51 (explaining that when chapter 95 applies, "the independent contractor's sole means of recovery is by satisfying section 95.003").

## C. Actual knowledge

Because chapter 95 applies to Valdez and Teran's claims, they were required to obtain a jury finding that "the property owner had actual knowledge of the danger or condition resulting in the personal injury, death, or property damage and failed to adequately warn." TEX. CIV. PRAC. & REM. CODE § 95.003(2). Valdez and Teran did not obtain a jury finding that Los Compadres had actual knowledge that the power lines were energized. Instead, Question 2 of the jury charge instructed that Los Compadres was negligent if it "knew or reasonably should have known of the danger" posed by the power lines.

Los Compadres objected to Question 2 during the charge conference, arguing that under chapter 95, "Los Compadres can only be liable if the jury finds that it had actual knowledge of any danger." It also submitted a proposed jury charge including a version of Question 2 that required actual knowledge to hold Los Compadres negligent. The trial court overruled Los Compadres's objections.

Valdez and Teran do not dispute that they did not obtain a jury finding on actual knowledge. They argue, however, that the evidence conclusively established Los Compadres's actual knowledge. *See* TEX. R. CIV. P. 279 ("Upon appeal all independent grounds of recovery or

18

of defense *not conclusively established* under the evidence and no element of which is submitted or requested are waived." (emphasis added)); *Wilz v. Flournoy*, 228 S.W.3d 674, 676–77 (Tex. 2007) (per curiam) (noting that when defendants "failed to obtain a jury finding on their affirmative claim," it was "waived on appeal unless they 'conclusively established' it"). We agree with Valdez and Teran.

"Actual knowledge requires knowledge that the dangerous condition existed at the time of the accident, as opposed to constructive knowledge[,] which can be established by facts or inferences that a dangerous condition could develop over time." *Ineos*, 505 S.W.3d at 568 (quoting *City of Corsicana v. Stewart*, 249 S.W.3d 412, 414–15 (Tex. 2008) (per curiam)). To conclusively establish actual knowledge, "the evidence must leave 'no room for ordinary minds to differ as to the conclusion to be drawn from it.'" *Int'l Bus. Machs. Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 235 (Tex. 2019) (quoting *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.*, 644 S.W.2d 443, 446 (Tex. 1982)).

Los Compadres's managing owner, Raul Medina, testified at trial that when the company purchased the property, it was aware of the power lines and AEP's easement along the back of the property. Medina testified that he did not know if Los Compadres's project manager and supervisor, Torres, had communicated with AEP about de-energizing the lines before work began near them. But based on our holding that Torres was an agent or employee of Los Compadres, any knowledge Torres had of the status of the line must be imputed to Los Compadres. *See La Sara Grain Co. v. First Nat'l Bank of Mercedes*, 673 S.W.2d 558, 563 (Tex. 1984) ("[A] corporation[] is bound by the knowledge of one of its agents if that knowledge came to him in the course of the

19

agent's employment.") (citing *City of Fort Worth v. Pippen*, 439 S.W.2d 660, 665 (Tex. 1969); *Wellington Oil Co. of Del. v. Maffi*, 150 S.W.2d 60, 63 (Tex. 1941)).

Paredes testified that "weeks" before the accident, he told Torres that "the lines were too close . . . in the back." Torres told Paredes that he would contact AEP and would "take care of the line." Torres also told Paredes to begin work on the foundation from the front because the line was energized and "it wasn't clear to see what was going to be done with that line." On the second day that Paredes, Valdez, and Teran worked on the site, Torres again told Paredes that the line was still energized, that he was working with AEP about the line, and to "work around it." On the day of the accident, Paredes spoke with Torres by phone about the status of the lines. Torres told Paredes that the line was still energized and would not be de-energized but to "go forward" with the work.

With this evidence, there can be no reasonable dispute that Torres had actual knowledge that the power lines were both present and energized, and thus that the "dangerous condition existed at the time of the accident." *Ineos*, 505 S.W.3d at 568 (quoting *City of Corsicana*, 249 S.W.3d at 414–15). And because Torres was Los Compadres's agent and his knowledge is imputed to the company, we agree with Valdez and Teran that the evidence conclusively established Los Compadres's actual knowledge of the dangerous condition.

## D. Control

Chapter 95 also required Valdez and Teran to establish that Los Compadres exercised "some control over the manner in which" Paredes performed the work, "other than the right to order the work to start or stop or to inspect progress or receive reports." TEX. CIV. PRAC. & REM. CODE § 95.003; *see Ineos*, 505 S.W.3d at 561. The jury found that Valdez and Teran satisfied this requirement, and as we have already held, the evidence conclusively established such control. Los

20

Compadres argues, however, that this jury answer has no effect because it fatally conflicts with the jury's separate finding that Los Compadres was not "responsible for temporary work, activity or function which made it possible to bring tools, equipment, machines or materials within six feet of the power lines."

A fatal conflict between jury answers exists when one answer would require a judgment in one party's favor while another answer would require a judgment in the opposing party's favor. *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 509 (Tex. 2018). But a party who claims that jury answers fatally conflict must raise that objection with the trial court before the court discharges the jury, so that the court can correct the error by providing additional instructions and retiring the jury for further deliberations. *Id.* at 518; *see* TEX. R. CIV. P. 295. Because Los Compadres did not object to the jury's allegedly conflicting answers before the trial court discharged the jury, it cannot now complain that the conflicting answers undermine the judgment based on the jury's verdict.

In light of the alleged conflict, and despite its failure to raise the conflict before the trial court discharged the jury, Los Compadres asks that we remand this case for a new trial in the interest of justice. We have remanded cases in the interest of justice when "one or more parties 'proceeded under the wrong legal theory,'" *Menchaca*, 545 S.W.3d at 521 (quoting *Boyles v. Kerr*, 855 S.W.2d 593, 603 (Tex. 1993)), when "the applicable law has . . . evolved between the time of trial and the disposition of the appeal," *id.* (quoting *Nat. Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 162 (Tex. 2012)), when we have clarified the law, *see id.* (citing *Hamrick v. Ward*, 446 S.W.3d 377, 385 (Tex. 2014)), and when we have overruled our own precedent, *see Westgate, Ltd. v. State*, 843 S.W.2d 448, 455 (Tex. 1992) ("The most compelling case for [a remand in the

21

interest of justice] is where we overrule existing precedents on which the losing party relied at trial."). As none of these circumstances exist here, we decline Los Compadres's request.

## E. Open and Obvious

Los Compadres argues it cannot be liable because it had no duty to warn Valdez and Teran about the power line because the danger the line presented was open and obvious. A danger is open and obvious when the evidence conclusively establishes that an invitee would have "knowledge and full appreciation of the nature and extent of danger," such that "knowledge and appreciation of the danger are considered as proved as a matter of law." *Adam Dante Corp. v. Sharpe*, 483 S.W.2d 452, 459 (Tex. 1972), *abrogated on other grounds by Parker v. Highland Park, Inc.*, 565 S.W.2d 512 (Tex. 1978). When the danger is open and obvious, the property owner generally has no obligation to warn of the danger or make the premises safe, as a matter of law. *Massman-Johnson v. Gundolf*, 484 S.W.2d 555, 556–57 (Tex. 1972).[12]

Whether a danger is open and obvious is a question of law determined under an objective test. *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 383 (Tex. 1995).[13] The question is whether the danger is "so open and obvious that as a matter of law [the plaintiff] will be charged with knowledge and appreciation thereof." *Parker*, 565 S.W.2d at 516. Under the objective standard,

---

[12] *See also Gen. Elec. Co. v. Moritz*, 257 S.W.3d 211, 215–16 (Tex. 2008) ("[O]ne who hires an independent contractor generally expects the contractor to take into account any open and obvious premises defects in deciding how the work should be done, what equipment to use in doing it, and whether its workers need any warnings.").

[13] By contrast, a landowner may also have no duty to warn or make safe if the claimant *subjectively* had actual knowledge of the dangerous condition. *See Austin v. Kroger Tex., L.P.*, 465 S.W.3d 193, 203 (Tex. 2015) ("When the condition is open and obvious *or* known to the invitee, however, the landowner is not in a better position to discover it." (emphasis added)); *Culotta v. DoubleTree Hotels LLC*, No. 01-18-00267-CV, 2019 WL 2588103, at *3 (Tex. App.—Houston [1st Dist.] June 25, 2019, pet. denied) (mem. op.) ("These two no-duty circumstances—when a hazard is known to the invitee and when a hazard is open and obvious—are two sides of the same coin: one focused on the subjective knowledge of the invitee and the other on what would be reasonably observable to a person exercising ordinary care under an objective standard.").

the question is not what the plaintiff subjectively or actually knew but what a reasonably prudent person would have known under similar circumstances. *Tex. Dep't of Hum. Servs. v. Okoli*, 440 S.W.3d 611, 614 (Tex. 2014). To properly apply an objective test, we must consider the "totality of" the "particular" circumstances the plaintiff faced. *State v. One (1) 2004 Lincoln Navigator*, 494 S.W.3d 690, 706 (Tex. 2016) ("[A]n objective determination . . . requires an examination of the totality of the circumstances."); *County of Cameron v. Brown*, 80 S.W.3d 549, 558 (Tex. 2002) (holding sudden darkness was not an open and obvious danger "considering the causeway's particular characteristics").

Based on the evidence in this record, we agree that the *presence* of the power line was open and obvious. In fact, Valdez and Teran both testified that they subjectively knew the power line ran along the back property line. And to be sure, "there is inherent danger in working around live wires," and those engaged to perform such work should be expected to "realize the danger of accidental contact with the charged line" or "to take reasonable measures to protect themselves." *Shell Oil Co. v. Songer*, 710 S.W.2d 615, 620 (Tex. App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.); *see also Corpus v. K–J Oil Co.*, 720 S.W.2d 672, 675 (Tex. App.—Austin 1986, writ ref'd n.r.e.) ("The fact that Sanchez and the other crewmen were not paying attention did not change the presence of the highline from a reasonably apparent condition into a dangerous condition about which the occupier of the premises had a duty to warn."). But we cannot say that under these particular circumstances, the fact that the power line was energized and thus dangerous was open and obvious as a matter of law.

Valdez and Teran both testified that they subjectively did not know or think the line was energized. Both testified that Paredes never told them whether the lines were energized. In

deposition testimony that the jury heard as part of Los Compadres's impeachment efforts, Teran testified that Paredes told them he had contacted the electric company and had "cut off" the power, and Valdez testified that the lines were "always" de-energized when he worked for Paredes. And the jury apparently believed this testimony, as it found (applying an objective standard) that Los Compadres, Paredes, and AEP each negligently caused the accident but Valdez and Teran did not.

The particular circumstances also include the statutory duties Los Compadres owed under these facts. As Valdez and Teran note, Chapter 752 of the Health and Safety Code imposed on those "responsible for the work" a duty to ensure the power line was de-energized before the work began. TEX. HEALTH & SAFETY CODE § 752.003(b);[14] *see Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 549 (Tex. 1985) (citing *Moughon v. Wolf*, 576 S.W.2d 603, 604 (Tex. 1978); *Mo. Pac. R.R. Co. v. Am. Statesman*, 552 S.W.2d 99, 102 (Tex. 1977)) (noting that statutes may "legislatively impose[] a standard of conduct"). Los Compadres disputes that it was the party "responsible for the work," but that point is irrelevant to the question of whether the energized power line presented an "open and obvious danger" to workers like Valdez and Teran, who were not responsible for the work. The fact that Valdez and Teran could reasonably assume that whoever was responsible for the work had fulfilled this duty precludes us from holding that, as a matter of law, the danger was open and obvious.

---

[14] Section 752.003(b) provides:

> A person . . . may not begin the work, activity, or function under this section until the person . . . responsible for the work, activity, or function and the owner or operator, or both, of the high voltage overhead line have negotiated a satisfactory mutual arrangement to provide temporary de-energization and grounding, temporary relocation or raising of the line, or temporary mechanical barriers to separate and prevent contact between the line and the material or equipment or the person performing the work, activity, or function.

TEX. HEALTH & SAFETY CODE § 752.003(b); *see also id.* § 752.007 (providing for criminal penalties for violations of chapter 752).

We conclude that although the presence of the power line was open and obvious as a matter of law, the fact that it was energized (and thus the dangerous condition it presented) was not. *See Sun Oil*, 594 S.W.2d at 128 ("Under the circumstances, the hazard posed by the live power lines was not obvious despite their visibility, since the location of the lines was only one component of the danger, the other being that they were charged with electricity."). Under this evidence, we conclude that the "obvious nature of the danger was not sufficient to make the premises reasonably safe as a matter of law." *Austin*, 465 S.W.3d at 204.

## F. Causation

Finally, Los Compadres argues that no evidence supports the jury's finding that Los Compadres's conduct proximately caused the occurrence because no witness was able to testify about how the accident actually happened. Valdez, Teran, and Paredes all testified that they felt a shock and were knocked unconscious as they were lifting the rebar into the poured concrete, but none could say how, why, or even whether the rebar actually made contact with the power line. Los Compadres contends that the evidence equally supported a variety of inferences, some of which would not support the jury's causation finding.

Valdez and Teran argue that Los Compadres waived this issue by failing to include it in its petition for review in this Court. Los Compadres points to a handful of instances in which the petition uses the word "caused," but the petition never identifies causation, or even how the incident occurred, as an issue. Because these questions are not fairly included within the issues the petition identified, we agree that Los Compadres has waived its request that we review this issue. *See* TEX. R. APP. P. 53.2(f).

25

But even if Los Compadres had not waived the issue, we do not agree with Los Compadres's argument. To prevail on their claims, Valdez and Teran had to establish that Los Compadres's negligent conduct was "a substantial factor in bringing about the injuries, and without it, the harm would not have occurred." *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017). Valdez and Teran argued and established that Los Compadres negligently failed to adequately warn them that the power line was energized or to make the power line safe by, for example, ensuring that it was de-energized before Paredes began his work. The evidence established that the power line snapped at the moment Valdez and Teran were injured, and as Los Compadres's expert witness agreed, photos entered into evidence showed a discoloration near the tip of the rebar that was consistent with its contact with the power line. This constitutes legally sufficient evidence that Valdez and Teran were injured when the rebar they were holding contacted the energized power line, and that Los Compadres's negligent failure to warn or make safe was a substantial factor in causing that result.

### III.
### Conclusion

Although we agree that Chapter 95 applies to Teran and Valdez's negligence claims against Los Compadres, we nevertheless conclude that the evidence and jury answers support the judgment against Los Compadres in this case. We affirm the court of appeals' judgment.

                                  _____
                                  Jeffrey S. Boyd
                                  Justice

Opinion delivered: March 26, 2021